# Illinois Official Reports

## Appellate Court

---

### *People v. Petrie*, 2021 IL App (2d) 190213

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KATIE L. PETRIE, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-19-0213 |
| Filed | August 25, 2021 |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, No. 16-CF-19; the Hon. Philip G. Montgomery, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Amaris Danak, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino, Edward R. Psenicka, and Barry W. Jacobs, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Zenoff and Jorgensen concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a bench trial, the defendant, Katie L. Petrie, was found guilty of two counts of aggravated battery to a child (a Class X felony) (720 ILCS 5/12-3.05(b)(1) (West 2014)) and two counts of aggravated battery to a child (a Class 3 felony) (*id.* § 12-3.05(b)(2)). The victim, R.N., was an infant who was in her care and who sustained permanent injuries. After her motion for a new trial was denied, Petrie was sentenced to 11 years' imprisonment. She appeals, arguing that (1) her jury waiver was invalid because she had requested a substitution of judge but no substitution occurred and that judge accepted her jury waiver and (2) her counsel provided her with deficient representation when he failed to adequately cross-examine the State's expert witnesses. We reverse and remand for a new trial.

¶ 2    Because the facts relevant to each issue are distinct, we proceed to our consideration of those issues. We will address the facts relevant to each issue as necessary.

### I. Substitution of Judge and Jury Waiver

#### A. Background

¶ 5    Petrie was arrested and charged on January 9, 2016. She appeared in court that day, represented by attorney Richard Russo under a limited appearance, and her bond was set at $500,000. Two days later, Russo filed a motion to reduce bond. On January 13, the parties appeared before Judge Philip Montgomery, who announced that the case was assigned to Judge Robbin Stuckert but she was out sick temporarily. That day, and at every succeeding court date until she was released on bond, Petrie was present in court via video.

¶ 6    On January 15, Russo filed a motion for an automatic substitution of judge pursuant to section 114-5(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-5(a) (West 2014)).

¶ 7    On January 19, the parties appeared again before Judge Montgomery (Judge Stuckert was still out), and Russo advised the court that Petrie had retained new counsel who would be filing an appearance shortly. The motion to reduce bond was continued. There was no mention of the motion for substitution of judge.

¶ 8    The next court date was January 26. The day before, the law firm of Johnson & Buh, LLC, filed its appearance as substitute counsel on behalf of Petrie. Attorney Johnson appeared in court before Judge Stuckert. He asked that the motion to reduce bond be heard the following week. Judge Stuckert agreed, but she noted that the prior defense counsel had filed a motion for substitution of judge. She stated that she was not sure "if that was addressed on the last court date." Johnson repeated his request that "the motion" be continued. Judge Stuckert set February 9 as the hearing date but asked Johnson to let her know before then whether he wanted to proceed with the substitution, because in that case she would not hear the bond reduction motion. Johnson said that he would do so. The written order entered on January 26 did not mention the motion for substitution of judge.

¶ 9    On February 9, attorney Buh appeared for the defendant. He asked for and was granted more time so that he could meet with Petrie. No one mentioned the motion for substitution of judge.

¶ 10    The hearing on the motion to reduce bond commenced on February 22 before Judge Stuckert. There was no mention of the motion for substitution of judge. The hearing continued

on February 29, when Judge Montgomery presided due to Judge Stuckert's absence. Judge Montgomery granted the motion, reducing the bond to $50,000. He also noted that the case would continue before Judge Stuckert. There was no mention of the motion for substitution of judge, which everyone appeared to have forgotten about.

¶ 11 Thereafter, Petrie was able to post bond. She was present in person at all later court dates relevant here. On May 16, 2016, after Petrie had been indicted by a grand jury, Judge Montgomery presided over her arraignment and admonished her regarding the charges against her. However, the case continued to be assigned to Judge Stuckert, who presided over most of the court dates during the next two years. On September 21, 2017, defense counsel advised Judge Stuckert that Petrie was willing to waive her right to a jury trial. Judge Stuckert questioned Petrie and found that her waiver was knowing and voluntary.

¶ 12 In March 2018, the case was transferred to Judge Montgomery, who began presiding over the case on April 5, 2018. After hearing from the parties about the status of the case, Judge Montgomery noted that a motion for substitution of judge had been filed in January 2016. Commenting that he did not know "what relevance it has really anymore," as Judge Stuckert had reassigned the case to him, he said that he "just wanted to bring that to everyone's attention that that was there." The attorneys did not respond to this comment and continued to discuss discovery issues.

¶ 13 At the next court date, however, defense counsel brought the matter up:

"[DEFENSE COUNSEL]: You had—the last time we were in court you had indicated—I believe it was the last time or the previous, that there was a substitution of judge with Judge Stuckert.

* * *

That was filed by a previous attorney. I didn't have anything to do with that, not that I'm having an issue with that. The issue is we executed a jury waiver which is a substantial right of my client before Judge Stuckert.

THE COURT: And I'm sure Judge Stuckert advised your client at the time that she waived it that a waiver is forever and she can't come back later on and change her mind.

[DEFENSE COUNSEL]: Correct, Judge. But the issue is it was after the substitution of Judge when Judge Stuckert was not allowed to do a substantive right.

THE COURT: Okay.

[DEFENSE COUNSEL]: I'm not saying that I want to go back to a Jury trial, Judge, I'm simply saying that this is an issue that I need to address with my client that I believe we need to re-execute another jury waiver because Judge Stuckert according to my understanding of substitution of judge, once that's filed, it's supposed to be immediately transferred to another judge. So we're talking about a substantive right that my client executed—

THE COURT: Well, let's stick with the motion that we have in front of us."

After the trial court heard and granted the defendant's motion to continue the trial date, it returned to the subject of how to proceed with respect to the earlier jury waiver:

"THE COURT: *** [H]opefully we can all be prepared to proceed on that status date with everything settled.

[DEFENSE COUNSEL]: Correct, Judge. I also anticipate at that time executing a jury waiver before your Honor.

- 3 -

THE COURT: Yeah, let's get that issue settled too. I hadn't thought of that, I'll be quite honest.

\* \* \*

[DEFENSE COUNSEL]: [I]f we continue this case for three weeks [for status], at that point I'll have—I'll speak with my client about executing a jury waiver and we can possibly set a trial date in August. \*\*\*

THE COURT: I'll be quite honest, [state's attorney], I had not thought of the waiver in conjunction with the motion for substitution.

[STATE'S ATTORNEY]: Well, Judge, I do not know if a defendant files a motion and never asks for a ruling on it, how that affects the case \*\*\* but I think that it's not perhaps as straightforward as [defense counsel] is stating it is.

THE COURT: Well, I suppose it could become straightforward if Ms. Petrie decides to execute a jury waiver in front of me.

\* \* \*

[DEFENSE COUNSEL]: And Judge, the reason why I brought up the jury waiver, what concerns me is if we go to trial \*\*\* and what happens on appeal.

\* \* \*

And I just want—I just want to be up front with everybody about my concerns about that substitution of judge. I don't know if this issue has arisen in the past, I haven't researched it. I thought the easiest way to cure it is if we execute another jury waiver, but this is something I need to speak with my client about."

¶ 14 At the next court date, Judge Montgomery set a new trial date. He then commented that he did not "know how much of an issue it is regarding the substitution of judge and the jury waiver that was obtained." He went on,

"I don't think it's an issue, because regardless of the SOJ being ruled on or not, it's no longer in front of Judge Stuckert and [the defendant has] waived her right to a jury trial. \*\*\* So unless you think it's an issue and you haven't [*sic*] prepared a motion, I would imagine that it will continue to a bench trial."

Defense counsel replied, "I fully expect that as well. \*\*\* I have no reason to indicate to your Honor or to the State that I would go forward as \*\*\* a jury trial." The court then stated that, if Petrie did not wish a bench trial, she would have to file a motion to withdraw the jury waiver. Defense counsel responded that he understood and said, "I don't plan on doing that, Judge."

¶ 15 No motion to withdraw the jury waiver was filed, and the case proceeded to a bench trial before Judge Montgomery. Petrie was convicted of all counts. One of the arguments in her posttrial motion for a new trial was the lack of a valid jury waiver due to the motion for substitution. The trial court denied the motion, saying that, "in regards to the substitution of judge, I don't believe that that's an issue that requires a new trial." Petrie now repeats her argument on appeal.

¶ 16                                B. Analysis

¶ 17 Section 114-5(a) of the Code (725 ILCS 5/114-5(a) (West 2014)) provides that, "[w]ithin 10 days after a cause involving only one defendant has been placed on the trial call of a judge[,] the defendant may move the court in writing for a substitution of that judge on the ground that

such judge is so prejudiced against him that he cannot receive a fair trial." It further provides that, once such a motion is filed, "the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion." *Id.* Our supreme court "has consistently held that the statute vests criminal defendants with the 'absolute right' to have an assigned trial judge substituted upon a timely written motion." *People v. Walker*, 119 Ill. 2d 465, 470 (1988). The failure to reassign a case upon the timely filing of a proper motion is reversible error requiring a new trial. See *id.* at 470-71; *People v. Tate*, 2016 IL App (1st) 140598, ¶ 19 (collecting cases).

¶ 18   The right to a substitution of judge has a long history in Illinois. As the *Walker* court noted, the right was first codified in 1874, almost 150 years ago. *Walker*, 119 Ill. 2d at 470. Defendants have a "basic constitutional right to a trial before a fair and impartial judge," and therefore "the provisions of the automatic-substitution-of-judge statute should be construed liberally to promote rather than defeat substitution." (Internal quotation marks omitted.) *Id.* at 470-71.

¶ 19   We observe that, because Judge Stuckert transferred the case to Judge Montgomery prior to trial, Petrie was not forced to proceed to a trial before the judge to whom she objected. Nevertheless, courts have generally held that, once a proper motion for substitution of judge is filed, any subsequent actions taken by the judge who is the subject of that motion are invalid and of no effect. See *People v. McDuffee*, 187 Ill. 2d 481, 492 (1999); *Tate*, 2016 IL App (1st) 140598, ¶ 20. Here, despite a timely motion seeking the substitution of Judge Stuckert, Judge Stuckert presided over multiple proceedings in the case after that point, including one that involved a substantial right of any criminal defendant: the decision whether to waive the right to a trial by jury. Petrie argues that Judge Stuckert's acceptance of her jury waiver was invalid and notes that she never executed any other jury waiver. Thus, she argues, her bench trial violated her constitutional right to a trial by jury, requiring a new trial.

¶ 20   The State does not quarrel with the general principles underlying Petrie's argument. Instead, it argues that those principles do not apply here, for three reasons: (1) the motion for substitution of judge was defective because it did not name Judge Stuckert as the judge sought to be substituted, (2) Petrie forfeited her argument because she failed to preserve the error by raising it in the trial court, and (3) Petrie's actions amounted to invited error or acquiescence to the trial court's failures to reassign the case and obtain a valid jury waiver. We examine each argument in turn.

¶ 21   The first argument need not detain us long. Section 114-5(a) provides that, within 10 days after a trial judge is assigned to a case, a defendant may seek "substitution of *that judge*" through a written motion. (Emphasis added.) 725 ILCS 5/114-5(a) (West 2014). The plain implication of this language is that the motion will be construed as seeking the substitution of the assigned judge, even if that judge is not identified by name in the motion. The statute goes on to say that a defendant "may name only one judge as prejudiced" unless the defendant is charged with a Class X felony, in which case the defendant is allowed to list two judges of whom he or she seeks substitution. *Id.*; see also *McDuffee*, 187 Ill. 2d at 487-88 ("a defendant must be granted an automatic substitution of judge if" substitution is requested in a timely written motion that, among other things, "names only one judge unless the defendant is charged with a Class X felony, in which case he may name two"). This provision, however, is simply a limit on the number of judges of whom a defendant may seek substitution, not a requirement that a defendant explicitly identify the assigned judge by name in the motion for substitution.

We are mindful that, in construing section 114-5, its provisions should be liberally construed to promote rather than defeat substitution. *McDuffee*, 187 Ill. 2d at 488. Here, where the record reflects that Petrie and her attorney were told that the case had been assigned to Judge Stuckert and the motion for substitution was filed only two days later, the obvious conclusion is that the motion sought the substitution of Judge Stuckert. We therefore decline to find the motion so defective that it failed to comply with the requirements of the statute.

¶ 22     The State's second argument fares no better. The State asserts that Petrie did not preserve the trial court's error in conducting a bench trial despite the lack of a valid jury waiver, because she failed to object to the error and did not "raise this specific issue directly" in her posttrial motion for a new trial. The record refutes these assertions: the defense attorney argued at length to Judge Montgomery, months before the trial took place, that Petrie's earlier jury waiver before Judge Stuckert was not valid because it occurred after the motion for substitution was filed, and the posttrial motion raised the same issue. Thus, the trial court had ample opportunity to consider the issue and correct any errors both before and after trial. There is no merit to the State's claim of forfeiture through failure to object.

¶ 23     Our conclusion is different, however, when we consider the State's argument that Petrie invited and acquiesced in the error through her conduct, estopping her from raising the error on appeal.

> "[A] party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (citing *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000), and *People v. Segoviano*, 189 Ill. 2d 228, 240-41 (2000)).

This type of waiver, which occurs through a defendant's own conduct or her affirmative acquiescence in the trial court's actions, is different than a forfeiture that occurs when a defendant fails to bring an error to the trial court's attention, and it is not subject to the plain error doctrine. See *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011) (citing *People v. Townsell*, 209 Ill. 2d 543, 547-48 (2004)).

¶ 24     Here, the record shows that Petrie either invited or acquiesced in the trial court's error at two points. First, she failed to secure a ruling on her motion for substitution, thereby abandoning it. The record reflects that on January 26, 2016, the first occasion that Judge Stuckert presided over the case, she pointed out the fact that a motion for substitution had been filed and indicated that she was willing to effectuate it, reassigning the case before she heard the pending motion to reduce bond. Petrie's new attorneys, who appeared on her behalf for the first time on that date, did not seem to have been aware of the motion for substitution. They agreed to advise Judge Stuckert before the hearing on the bond motion commenced about whether they intended to stand upon the motion for substitution filed by the previous attorney. However, they failed to do so.

¶ 25     It is the responsibility of the party filing a motion to bring it to the trial court's attention and have it resolved. *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 54. Where no ruling has been made on a motion, the presumption is that the motion was waived or abandoned. See *Jackson v. Alverez*, 358 Ill. App. 3d 555, 563 (2005) (collecting cases). A party cannot appeal an issue raised by motion where the motion was not ruled upon. See *People v. Hall*, 114 Ill. 2d 376,

414 (1986) ("Because the defendant did not obtain a ruling on the question, he cannot now complain that the court erred.").

¶ 26    Petrie stresses the fact that a motion for substitution of judge as of right can and should be granted automatically by the court where, as here, there was no contemporaneous objection by the nonmovant. See *People v. Gold-Smith*, 2019 IL App (3d) 160665, ¶ 29 ("the statute makes no provision for a hearing; rather it requires the court to transfer the case to another judge upon receipt of defendant's request"). However, she cites no law suggesting that, when new counsel becomes involved before a motion for substitution has been granted, the movant may not be offered the chance to reevaluate whether she wishes to stand upon her motion. Judge Stuckert did not err in offering Petrie this option, and defense counsel agreed to inform Judge Stuckert of Petrie's decision before the judge heard and ruled on the motion to reduce bond. After that point, as defense counsel was well aware, substitution would no longer be available. See *McDuffee*, 187 Ill. 2d at 488 (automatic substitution of judge may not be had once the assigned trial judge has made a substantive ruling in the case). Despite being made aware of the pending motion for substitution and promising to inform the court whether Petrie wished to proceed with it, defense counsel did not do so. Nor did counsel ensure that the motion was ruled on. This failure amounted to abandonment of the motion.

¶ 27    Petrie argues that the right to an automatic substitution of judge is personal to a defendant and cannot be waived by the action or inaction of counsel. *Gold-Smith*, 2019 IL App (3d) 160665, ¶ 29. However, Petrie was present in court via video on both (1) January 26, 2016, when Judge Stuckert brought up the motion for substitution and warned that she needed to know whether Petrie wished to proceed prior to the bond reduction hearing and defense counsel agreed to confer with Petrie and advise Judge Stuckert of the results, and (2) February 22, when the bond reduction hearing commenced without further discussion of the motion for substitution. The record thus supports the conclusion that Petrie herself was aware of the issue and voluntarily abandoned her motion for automatic substitution of judge, estopping her from complaining about Judge Stuckert's failure to rule on that motion or the fact that the case proceeded before Judge Stuckert for the next two years.

¶ 28    Second, even if Petrie did not abandon or implicitly withdraw her motion for substitution, she acquiesced to her case being tried as a bench trial before Judge Montgomery by failing to take any action whatsoever to prevent it. On the first court date after the case was transferred to him, Judge Montgomery noted the existence of the motion for substitution. At the next court date, defense counsel suggested that, as the case had proceeded before Judge Stuckert despite the motion having been filed, Petrie's jury waiver might be invalid. However, defense counsel did not present any legal authority to support that theory and further denied any intent to return the case to the jury trial call. Rather, defense counsel simply posited that perhaps Petrie should again waive her right to a jury trial, this time before Judge Montgomery. At the following court date, Judge Montgomery stated that he did not view it to be a problem that Judge Stuckert had presided over Petrie's jury waiver and that the case would proceed to a bench trial unless Petrie filed a motion to withdraw her jury waiver. Defense counsel said that he understood and that he did not intend to file such a motion.

¶ 29    At that point, Petrie had several options. If she disagreed with her counsel and did not wish to be tried by Judge Montgomery in a bench trial, she could have moved to withdraw her jury waiver. Alternatively, if she believed that there was nothing to be withdrawn because the prior waiver was not legally valid, her counsel could have filed a motion arguing that proposition,

supported by legal authority. If she did not mind Judge Montgomery determining her guilt or innocence but nevertheless believed that her prior waiver was invalid, she could have insisted on executing a new jury waiver before Judge Montgomery. Instead, Petrie chose to do nothing, despite the fact that Judge Montgomery clearly stated that her case would proceed to a bench trial before him unless she filed a motion. By choosing to do nothing, Petrie acquiesced in the trial court's determination about how to handle the jury waiver issue, thereby waiving her right to raise the issue on appeal. See *Swope*, 213 Ill. 2d at 217.

¶ 30    Petrie once again argues that the right at stake—her right to be tried by a jury—was one that was personal to her and thus it could not be forfeited through the action or inaction of her attorneys. See 725 ILCS 5/103-6 (West 2014); *People v. Townsend*, 2020 IL App (1st) 171024, ¶ 24. However, when a defense attorney states, in open court and in the defendant's presence, that a defendant is waiving a jury trial and the defendant does not object, the waiver will be considered knowing, voluntary, and valid. See *People v. Frey*, 103 Ill. 2d 327, 332 (1984) ("Recognizing that the accused typically speaks and acts through his attorney, we have given effect to jury waivers made by defense counsel in defendant's presence where defendant gave no indication of any objection to the court hearing the case."). Here, as in *Frey*, the record is clear that Petrie understood her right to a jury trial, having been admonished regarding that right by Judge Stuckert. Further, she was present in the courtroom on April 5, 2018 (when Judge Montgomery first mentioned the motion for substitution), April 26, 2018 (when the parties and the judge discussed at length the impact of that motion on Petrie's earlier jury waiver), and May 31, 2018 (when Judge Montgomery indicated that he did not view the issue as a problem and that the case would proceed to a bench trial unless Petrie filed a motion to withdraw her waiver). At no point did Petrie indicate any objection either to a bench trial or to Judge Montgomery's statement that the case would proceed to a bench trial unless a motion to withdraw was filed. Thus, just as in *Frey*, it is clear from the record that Petrie herself was fully aware of the issue and her choices, and her lack of objection to the statements of her counsel may be taken as voluntary acquiescence to a bench trial. See *id.* at 333 (jury waiver was valid where "defendant was aware of his right to a jury trial and was present" in court "when the jury waiver was discussed").

¶ 31    For all of these reasons, we reject Petrie's argument that her jury waiver was invalid. We turn to the second issue raised on appeal.

¶ 32                    II. Ineffective Assistance of Counsel

¶ 33    Petrie's second argument is that her trial counsel's performance at trial was so deficient that it fell below the level of constitutionally required effectiveness. Specifically, Petrie argues that her counsel's failure to cross-examine one of the State's expert witnesses regarding the bases for his opinions violated the standard of reasonable performance and led to her convictions.

¶ 34                             A. Background

¶ 35    R.N. was born on June 16, 2015. Beginning in August 2015, his mother, Jennifer N., took R.N. to Petrie's home day care. At about 11:20 on the morning of December 15, 2015, Petrie called Jennifer, saying that R.N. was having a seizure. Petrie then called 911, and emergency medical technicians arrived. When they (and someone from the county sheriff's office) spoke with her, Petrie told them that R.N. had been dropped off about 7 a.m. He was sleepy but

otherwise seemed fine. He napped from 7:30 to 9:45. When he awoke, he was playing and happy. At about 11 a.m., Petrie fed him some pureed bananas prepared by his mother without incident and then took him into the living room to give him a bottle. After he had drunk about two ounces, he vomited profusely. She laid him on the floor and went to get some wipes from a container a few feet away. When she turned around, he seemed to be having a seizure: his jaw was clenched and his arms were stiff. She immediately called Jennifer and then called 911.

¶ 36    When the emergency medical technicians arrived, R.N. was pale, lethargic, and unresponsive, and he periodically stopped breathing. They performed cardiopulmonary resuscitation (CPR) and gave him oxygen in the ambulance. R.N. was taken to Kishwaukee Hospital. After a computed tomography (CT) scan showed subdural hematomas and a possible skull fracture, he was airlifted to Rockford Memorial Hospital. When he arrived at the hospital, he was found to have substantial swelling of his brain, a skull fracture of his left temporal bone, widespread and multilayer retinal hemorrhages in both eyes, and a healing fracture of a lower rib. A portion of his skull was surgically removed to relieve the pressure on his brain; a few weeks later when R.N.'s brain swelling had decreased, it was reinserted. He later had eye surgery at Lutheran Hospital and spent time at a rehab center. As the result of his injuries, R.N. sustained significant brain damage and had limited vision (especially in one eye), developmental delays, behavioral problems, and limited use of his right arm. He wore orthotics to correct bone structure in his legs, limped, and had a scar on his head.

¶ 37    At trial, there was no real dispute about most of the elements of the charged offenses, including that R.N. was below the age of 13, Petrie was an adult, and R.N.'s injuries amounted to serious bodily harm. The question was what, and who, caused R.N.'s injuries. We summarize the evidence pertinent to those issues.

¶ 38    Jennifer testified that R.N. had a cold in early December and she took him to the doctor, who did not prescribe any medication. About six days before December 15, R.N. rolled off the couch when Jennifer was changing his diaper. He cried, and Jennifer called the pediatrician, who told her to call back if other symptoms developed, but none did. R.N. was congested from the cold and coughed a lot through December 11. On December 12, the family went to Chicago. R.N. was not coughing or congested. On Sunday, December 13, the family went to a party at Jennifer's parents' boat club. R.N. was in a good mood, and Jennifer took a video, which was played for the court. On the evening of Monday, December 14, R.N. threw up. Tuesday morning, R.N. seemed fine. Jennifer did not recall whether he ate that morning before she took him to day care at Petrie's house.

¶ 39    After R.N. was taken to the hospital, Jennifer learned that, among other things, R.N. had a broken rib that was older and healing. She had never seen any sign that he had a broken rib, but he was a colicky baby who cried a lot, so she might not have associated it with a broken rib if he cried when someone picked him up.

¶ 40    Eric N., R.N.'s father, worked two jobs: he drove a school bus in the early morning, worked for another company until 2 p.m. or so, drove the afternoon shift on the school bus, and then returned to the other company. He usually got home around 8:30 or 9:30 p.m. R.N. generally woke up two or three times each night, and Eric was usually the one who woke up with him. Eric confirmed that R.N. was sick with a cold in early December. R.N. showed no sign of pain from a broken rib when Eric held him, and Eric did not know how R.N. got the broken rib. On the night of December 14, R.N. followed his usual sleep pattern, and Eric did not notice any

difference in him. Both Eric and Jennifer denied ever shaking R.N., hitting him in the head, or slamming his head into anything.

¶ 41    At the hospital on December 15, R.N. was found to have a fracture of his left temporal bone, left side brain swelling, and a subdural hematoma (a collection of blood under the dura, or covering of the brain), as well as blood in the interhemispheric fissure between the two halves of the brain. Dr. Todd Alexander, a neurosurgeon, performed surgery on R.N., removing about half of his skull to relieve the pressure on his brain from swelling. Dr. Alexander also drained the subdural hematoma, which consisted of new blood (less than 12 hours old). Dr. Alexander noted the skull fracture, which was not easily seen on the CT scan and was fully visualized only during the surgery. The fracture had several branches and extended from near R.N.'s left ear to the top of his head.

¶ 42    Based upon the skull fracture and the location of the blood and swelling on the same side of the head as the fracture, Dr. Alexander believed that the cause of R.N.'s injuries was trauma to the head. To produce the kind of fracture he saw, the primary point of contact must have been the left side of R.N.'s head. The injuries could not have been caused by a fall from a couch. A fall from 2½ or 3 feet onto even a hard surface would not cause the level of injury he saw unless some additional force had been used. The force needed to produce the injuries— the skull fracture and tears of multiple veins in the brain—would require a car accident, a fall from more than five or six feet, or a traumatic blow to the head. Because there was no evidence in R.N.'s history of any accident of that type, Dr. Alexander believed that the injuries were nonaccidental.

¶ 43    As for the timing, based on the kind of bleeding, the amount and location of the blood and the swelling, and "the reaction that was going on in the brain," Dr. Alexander believed that the injury occurred hours rather than days before R.N.'s seizure began. Although the injury could have occurred as long as six to eight hours before, Dr. Alexander thought that the injury most likely occurred only an hour or so before R.N. arrived at the hospital.

¶ 44    Dr. Raymond Davis, a pediatrician who was board certified in child abuse pediatrics and who worked regularly with the Medical Evaluation Response Initiative Team (MERIT), an advocacy program funded by the Department of Children and Family Services, testified for the State. Dr. Davis was not a neurologist or neurosurgeon. He consulted on R.N.'s case on December 16, 2015, the day after surgery. He reviewed R.N.'s medical records, including Dr. Alexander's postsurgical notes, and spoke with R.N.'s parents. He also physically examined R.N. The physical exam did not reveal any bruises. Soft tissue injury to the neck would be best seen on a magnetic resonance imaging (MRI), but no MRI was done at that point.

¶ 45    Dr. Davis testified that the CT scan showed a lot of blood (no older than about 12 hours) in the interhemispheric fissure and all over the left side of the brain. The amount of swelling on the left side could be seen by the fact that the midline of the brain had been pushed to the right and by the lack of gray-white differentiation, showing that the usual "squiggles" in the brain itself had been flattened out by pressure. This indicated a hypoxic-ischemic injury with decreased blood and oxygen available on the left side. He did not see any skull fracture on the CT, but he learned about it from Dr. Alexander's notes and did not doubt that Dr. Alexander's description was accurate. R.N.'s X-rays showed a healing posterior fracture of the eleventh rib that was likely 7 to 10 days old. Posterior rib fractures like this were often caused by squeezing forces consistent with shaking. An ophthalmological exam of R.N.'s eyes showed multilayer retinal hemorrhages extending to the periphery in both eyes.

- 10 -

¶ 46    Dr. Davis ordered coagulation studies and tests for infection; the results of these tests ruled out blood diseases, infection, and various other natural causes of seizures and bleeding. The full skeletal series of X-rays did not show any diseases, abnormalities, or fractures other than the rib fracture. Although no MRI was done initially, an MRI done later showed areas of dead brain tissue on the left side of R.N.'s brain.

¶ 47    Dr. Davis described how forward-and-backward acceleration and deceleration forces, often called "shaken-baby syndrome" (SBS), could cause hematomas due to tears of the veins that extended from the brain through the dura. In his opinion, the bleeding all over the left side of R.N.'s brain, coupled with the extensive retinal hemorrhages, indicated that R.N.'s injuries were caused by SBS. Although retinal hemorrhages could be caused by something other than SBS, extensive retinal hemorrhages like those seen in R.N. could only be caused by "very high trauma acceleration-deceleration injuries," like from car accidents or SBS. The bleeding and swelling would cause "an immediate concussive episode" in which R.N. would not be responsive and could also cause seizures and breathing difficulties as the swelling pressed on areas of the brain that controlled breathing. Both of those were consistent with the reports of what actually happened with R.N. Dr. Davis did not believe that the bleeding and swelling were caused by a fall or other impact, because they were diffuse over the left side of the brain, not just around the point of impact.

¶ 48    The skull fracture was not caused by SBS but by a forceful impact. It was significant that the fracture was of a temporal bone, as accidents more commonly resulted in fractures of the parietal bones or sometimes the frontal or occipital bones, while temporal fractures were more often found to have resulted from child abuse. However, Dr. Davis could not form an opinion as to how the fracture occurred.

¶ 49    As for when the injuries occurred, Dr. Davis could not say when the skull fracture had occurred; it could have been weeks or more. As for the bleeding and swelling, however, Dr. Davis was adamant that it could only have occurred immediately before the seizure, between 11 and 11:20 a.m. He opined that such massive injury and swelling would have an immediate effect and that there would not be a "lucid interval" (a period in which an injured child appears normal). Further, Petrie's own reports described R.N. as happy and able to eat without difficulty only moments before the seizure. Dr. Davis opined that R.N. would not have been "happy" if he had a severe brain injury; the severity of the injuries would have resulted in immediate symptoms. For this reason, although he was not a neurosurgeon like Dr. Alexander, he disagreed with Dr. Alexander's estimate that the injury could have occurred up to six to eight hours earlier.

¶ 50    On cross-examination, Dr. Davis conceded that, although the acceleration-deceleration forces must have been substantial to cause the blood and swelling shown on the CT scan, the damage was only on the left side of the brain and no injury to the right side could be seen. However, CT scans did not always show brain damage, and R.N. did have hemorrhages in both eyes. SBS was commonly associated with freshly broken ribs, bruises, long-bone fractures, and retinal hemorrhages; of these, R.N. had only the retinal hemorrhages. Dr. Davis agreed that healing rib fractures were fragile and the previously fractured rib could easily have refractured if R.N. were shaken and that there was no sign of recent injury to the rib. Dr. Davis also agreed that R.N.'s vomiting the night before could be significant. Nevertheless, he adhered to his opinion that the injury that caused the bleeding and swelling in R.N.'s brain (which in turn caused the brain damage and retinal hemorrhages) occurred immediately before the

- 11 -

seizure. Defense counsel did not cross-examine Dr. Davis specifically about the basis for any of his statements, including his statement that there could not have been a "lucid interval" after the injury, in which R.N. appeared to be his usual self, before the seizure and other signs of distress began.

¶ 51 Dr. Davis admitted that one doctor's note stated that R.N. had fallen only two days before the seizure, but he discounted that because the doctor had drawn that information from the emergency room records at Kishwaukee Hospital and did not speak directly to the parents. Dr. Davis had spoken to R.N.'s parents, who told him that the fall had occurred closer to two weeks ago. He admitted that in fact, according to his notes, the parents had told him that the fall occurred nine days before the seizure. When asked why he described that period as "two weeks," Dr. Davis said that he was "bad at math." Dr. Davis agreed that falls of less than 40 inches could cause a skull fracture. However, based on a big study out of California, he opined that such falls did not cause life-threatening injuries requiring surgical intervention.

¶ 52 Dr. Joseph Scheller, a board-certified pediatric neurologist and an expert in neuroimaging, was the sole witness for the defense. Before forming his opinions, he reviewed all of R.N.'s medical records, from birth through the present. He began by noting that retinal hemorrhages occurred when there was pressure on the blood vessels within the skull, as the retinal vessels were the most likely place to allow blood to escape. They could be caused by many things, not just SBS, including birth itself: 30% of healthy babies were born with some retinal hemorrhages.

¶ 53 R.N. had a subdural hematoma, swelling, and a skull fracture on the left side. To a neurologist, that added up to an impact injury that caused complications on December 15, 2015. The number one cause of a subdural hematoma was an impact injury. SBS was developed as an explanation for when the brain showed an impact injury without a skull fracture or other evidence of impact.

¶ 54 Dr. Scheller discussed R.N.'s medical records. The December 2015 CT scan showed fresh blood (from the last day or two) in the intercranial fissure and huge pressure from the swollen left side of the brain against the right side. Other than that pressure, however, there was no evidence of any problem with the right side of R.N.'s brain. The retinal hemorrhages were caused by the pressure from the brain swelling, and they were in both eyes because the left side of the brain was pushing into the right side. They persisted for several days after the surgery.

¶ 55 An MRI taken a little over a week after R.N.'s seizure showed that the right half of his brain was "perfectly normal" but the left half had begun to atrophy. A CT scan from May 2017, over a year later, showed that the left side of R.N.'s brain was atrophied and "withered." The right side was healthy, without any damage.

¶ 56 Dr. Scheller did not believe that R.N.'s injuries were caused by shaking, for two reasons. First, there was no sign of any injury to the right side of R.N.'s brain, as there would be if he had been shaken. One could not shake half the brain without simultaneously shaking the other half as well. Second, there was evidence of an impact injury: the skull fracture on R.N.'s left side. Dr. Scheller believed that R.N.'s injuries resulted from an impact injury to the left side of his head that caused an acute subdural hematoma and also caused the left side of his brain to swell. That swelling, which pushed against the right side, caused the retinal hemorrhages in both eyes as well as the eventual brain damage.

¶ 57        As for the timing of the impact injury, based on Dr. Scheller's 30 years of experience as a practicing pediatrician seeing children with head injuries, he believed that it could take up to 48 hours for symptoms to show themselves. A snowball effect could occur, in which minor bleeding from an impact could cause a hematoma (collection of blood) that pushed against the dura, creating a space between the brain and the dura, and that in turn could cause further tears of blood vessels and further enlargement of the hematoma. Thus, a smaller hematoma could have led to the diffuse subdural hematoma and blood seen on December 15. He opined that R.N.'s skull fracture and subdural hematoma could have occurred anytime between December 13 and 15. The fracture could be the result of an accident; both the medical literature and his own experience practicing medicine supported that possibility.

¶ 58        On cross-examination, Dr. Scheller agreed that R.N. had no preexisting conditions that would account for his state on December 15. Symptoms of a subdural hematoma included headache, lethargy, vomiting, weakness, inability to walk straight, seizures, and coma. Of these, R.N. had lethargy, vomiting, and seizure on December 15. The trauma that caused R.N.'s injuries could have occurred on December 15, shortly before he was taken to the hospital. Dr. Scheller acknowledged that he was paid about $2500 to review R.N.'s records and another $2500 to testify and that in the last 15 years he had testified only on behalf of defendants. However, he had reviewed many cases of suspected abusive head trauma in which he concluded that he could not testify for the defense and had told defense attorneys that.

¶ 59        The State then called Dr. Davis to testify in rebuttal. He stated that R.N.'s injuries were caused by both shaking and impact. He believed that shaking had occurred, because the subdural hematomas were diffuse, not localized. As for why the right side of R.N.'s brain showed no injury, even in "confirmed" cases of SBS (in which a confession or autopsy supplied evidence of shaking), some cases—20 to 30%—showed injury on only one side. Further, sometimes the injury to one side existed but could not be seen, but there was later evidence of damage to both sides.

¶ 60        During closing arguments, defense counsel argued that the evidence did not prove beyond a reasonable doubt that the injury occurred while R.N. was in Petrie's care. Counsel noted that the State's two experts disagreed on several things, including the cause of the subdural hematoma: although Dr. Davis believed that it was caused by shaking, Dr. Alexander never suggested that and instead stated that it was caused by the skull fracture, similar to the conclusion of the defense neurologist, Dr. Scheller. Counsel pointed to the absence of injury to the right side of R.N.'s brain and the lack of any reinjury to R.N.'s 7- to 10-day-old healing rib fracture, arguing that they undermined Dr. Davis's conclusion of SBS. Counsel also emphasized the opinions of Drs. Alexander and Scheller that the hematoma could have been caused earlier than the morning of December 15, during a time when R.N. was not in Petrie's care. The State responded that it did not need to prove the mechanism of R.N.'s brain injury and retinal hemorrhages, only that Petrie caused them and did so knowingly.

¶ 61        In finding Petrie guilty of all counts, the trial court took note of the video from December 13, which showed R.N. "smiling, laughing, giggling, and kicking his legs" in response to tickling, and the testimony of R.N.'s parents that he appeared fine until he was dropped off at Petrie's day care and that they did not abuse him, which the court found to be credible. The trial court found that, when R.N. arrived in Petrie's care on December 15, "he was fine, or at a minimum, not exhibiting any outward signs of illness or injury." In assessing the expert testimony, the trial court noted that Dr. Davis was board certified in child abuse pediatrics,

unlike Dr. Scheller, and that Dr. Davis worked with MERIT to provide medical examinations in cases of suspected child abuse but Dr. Scheller did not. Further, Dr. Scheller had an interest that Dr. Davis did not, in that about three-quarters of his income was derived from testifying for the defense in child abuse cases. The trial court stated that Drs. Alexander and Davis did not have these "interests, biases, and prejudices." Nevertheless, even Dr. Scheller agreed that the symptoms of a subdural hematoma could occur immediately, including the symptoms that R.N. displayed. As for Dr. Scheller's testimony that the injury could have occurred up to two days earlier but the symptoms did not manifest until the defendant was in Petrie's care, the trial court found that testimony not to be credible. Petrie herself had told witnesses that R.N. was smiling and playing until he vomited and began seizing. The trial court found that the evidence therefore showed that only Petrie could have inflicted the injuries and that her actions were knowing and not accidental.

¶ 62                                                    B. Analysis

¶ 63        On appeal, Petrie argues that her trial counsel provided ineffective assistance by failing to sufficiently cross-examine Dr. Davis regarding the bases for his opinions. In particular, she contends that counsel should have challenged Dr. Davis about (a) the support for his statement that there could not be a "lucid interval" in which a child with a subdural hematoma and brain swelling appeared normal and (b) whether an accidental cause such as aspiration of vomit could have caused or exacerbated R.N.'s condition.

¶ 64        The sixth amendment to the United States Constitution grants defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). Under *Strickland*, a defendant arguing ineffective assistance of counsel must show not only that his or her counsel's performance was deficient but that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Under the two-prong *Strickland* test, "a defendant must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Id.* at 144. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687.

¶ 65                    1. Whether Counsel's Performance Was Unreasonable

¶ 66        There is a strong presumption that counsel's actions or inactions—such as the decision not to present certain arguments or not to call witnesses, including the client herself—constitute sound strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To prove otherwise, a party must show that counsel's conduct was "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 67        Petrie argues that defense counsel should have questioned the basis for Dr. Davis's opinion that, with the type of injury sustained by R.N.'s brain, there would not have been a "lucid interval," *i.e.*, a period of time after the injury occurred in which R.N. appeared to be fine. She asserts that the question of timing was pivotal in this case and that the only way to establish when the causal event occurred was through expert testimony. Both of the neurologists, Dr. Alexander and Dr. Scheller, believed that the causal injury was the skull fracture, which could

- 14 -

have occurred several hours before R.N.'s seizure began, although Dr. Alexander believed it was likely shorter. Dr. Davis was the only expert who opined that the causal injury (in his view, shaking) must have occurred immediately before the seizure, stating that there could be no lucid interval. However, despite the existence of studies (cited by Petrie in her brief) showing that a lucid interval has been observed in children with similar injuries, defense counsel did not ask Dr. Davis to identify a basis in the professional literature for his immediate-effect/no-lucid-interval opinion, and he did not inquire whether the general consensus of the professional community supported that opinion. Instead, counsel simply let Dr. Davis state his opinion as if it were fact.

¶ 68 An expert opinion must be based on facts or data reasonably relied upon by experts in that particular field. *People v. Comier*, 2020 IL App (1st) 170500, ¶ 81; *People v. Burhans*, 2016 IL App (3d) 140462, ¶ 30; Ill. R. Evid. 703 (eff. Jan. 1, 2011). If the expert is proffered by the State, the State bears the burden of establishing the foundation for the expert's opinion. *Burhans*, 2016 IL App (3d) 140462, ¶ 30. If the State fails to do so, the trial court should not allow the opinion into evidence. *Id.* ¶ 31.

¶ 69 An expert may testify to an opinion without first identifying the basis for the opinion. *People v. Murray*, 2019 IL 123289, ¶ 31; Ill. R. Evid. 705 (eff. Jan. 1, 2011). The burden then shifts to the opposing party to explore the missing information through cross-examination. *Murray*, 2019 IL 123289, ¶ 33. However, the burden remains on the State to prove all the elements of the offense, which may include the burden of laying a proper foundation for the admission of an expert opinion relevant to one of those elements. *Id.* ¶ 37.

¶ 70 In this case, Dr. Davis testified on direct examination that, with the level of swelling R.N.'s brain experienced, there would be an immediate effect such as nonresponsiveness or seizure. Even if a child was not unresponsive, "an injury like that" would cause immediate observable effects such as "extreme irritability, lethargy, vomiting, [and] listlessness," and the child would not appear normal. Dr. Davis stated that he held this opinion to a reasonable degree of medical certainty and that it was based on principles that were generally accepted within the medical community. However, he did not say what those principles were or identify any studies or publications supporting his statement. On cross-examination, defense counsel asked if Dr. Davis disagreed with Dr. Alexander's testimony that the injury could have occurred as much as six to eight hours before the symptoms, and Dr. Davis said that he did disagree. Defense counsel did not question him further about that disagreement or its basis in the medical literature.

¶ 71 On redirect examination, Dr. Davis expounded on his opinion once again:

"So an injury like [R.N.'s] could take time to show itself, okay. It's a severe injury, that will definitely show itself at some point. The bleeding was fresh, not showing signs of clotting, so likely within 12 hours. He had seizures and signs of—however, that type of an injury will cause an immediate effect and a continued effect. So there will not be a, quote, lucid interval.

You will not get that injury eight hours ago, and then be normal that morning when dad feeds him, normal when mom is up with him smiling and happy, go to the sitter's, be normal and smiling and happy from 9:45 to 11, and then all of a sudden I'm just going to try to die suddenly. That does not happen in this type of an injury to the brain tissue."

Dr. Davis then agreed that "[i]n general an injury like that could present over time," which is why he would work backward from the event, speaking "with the parents and everybody else to find out when was that child smiling and happy last," because that was "the only way to define the time of injury in these types of situations." Thus, his disagreement with Dr. Alexander's testimony and his opinion that the causal injury occurred immediately before the seizure were based on "the reports of [R.N.'s] behavior during the hours preceding when he was taken to the hospital."

¶ 72   It is clear that Dr. Davis believed that an injury sufficient to cause R.N.'s brain to ultimately bleed and swell to the point of seizure could not have occurred without immediate observable symptoms. What is not clear is his reason for this belief. At no point in any of this testimony did Dr. Davis testify that his opinion was the general consensus in his field of child abuse pediatrics or identify any professional literature supporting his opinion. Thus, his opinion was subject to objection as being inadmissible for lack of foundation. See *Burhans*, 2016 IL App (3d) 140462, ¶ 31. Indeed, although it might have been sufficient for him to testify that his opinion was based on his own medical training and experience (see *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 95), he did not even do this. However, defense counsel never objected based on the lack of foundation or pressed Dr. Davis to identify any studies supporting his opinion. Petrie argues that this opinion was vital to the State's case that she was the only one who could have caused R.N.'s injuries and thus no reasonable attorney would have failed to cross-examine Dr. Davis regarding the foundation for his opinion.

¶ 73   The State asserts that Petrie forfeited her argument about Dr. Davis's immediate-effect/no-lucid-interval opinion because the defense did not request a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to determine whether Dr. Davis's opinion had a valid scientific basis. See *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003) (appellant forfeited argument that medical opinion evidence should not have been admitted by failing to object to its admission or seek a *Frye* hearing on its admissibility). We find this argument unpersuasive for two reasons. First, Illinois courts have held that, when a conclusion that a child's injuries were caused by shaking is based on a medical expert's experience and training rather than on a scientific principle or methodology, no *Frye* hearing is required. *Schuit*, 2016 IL App (1st) 150312, ¶¶ 84-85; *People v. Cook*, 2014 IL App (1st) 113079, ¶ 52. Here, the record does not show that Dr. Davis's immediate-effect/no-lucid-interval opinion was based on any scientific principle or methodology. Thus, under the logic of *Schuit* and *Cook* (which we note without expressly adopting), no *Frye* hearing was required, so defense counsel's failure to seek one could not forfeit Petrie's argument. Second, while a contemporaneous objection (and in some cases, a *Frye* hearing) is necessary to preserve an *evidentiary* argument (*Snelson*, 204 Ill. 2d at 24-25), the lack of such an objection has no effect on an argument that trial counsel provided *ineffective assistance*. Indeed, Petrie's very point is the failure of her trial counsel to object to the lack of foundation for Dr. Davis's opinions. We reject the State's forfeiture argument.

¶ 74   The State next argues that defense counsel performed well, cross-examining Dr. Davis ably on several points and also countering Dr. Davis's opinions through the testimony of Dr. Scheller. Dr. Scheller disputed Dr. Davis's opinion that the causal injury must have produced an immediate effect and there could not have been a period of normalcy. He testified that the skull fracture was the cause of R.N.'s brain injuries and that both the medical literature (some of which he detailed) and his own 30 years of experience as a pediatric neurologist supported his opinion that there could be a period of up to two days before a subdural hematoma resulted

in observable symptoms. The State argues that the introduction of contrary expert testimony distinguishes this case from *People v. Watson*, 2012 IL App (2d) 091328, ¶ 32, in which we found that a defendant's attorney fell below the constitutionally mandated threshold of effectiveness because he failed to challenge the foundation of an expert's opinion on a central issue in the case. The defense theory at trial here was that Dr. Davis was wrong in his opinion that R.N.'s injuries were caused by shaking and that the actual cause was a traumatic impact linked to the skull fracture, which could have occurred when R.N. was not in Petrie's care. The State asserts that defense counsel advanced this defense with skill.

¶ 75     We agree with these points. However, challenging Dr. Davis's immediate-effect/no-lucid-interval opinion by pressing him on the basis for it was fully compatible with defense counsel's trial strategy. This was not a case in which challenging the foundation for Dr. Davis's opinion would have conflicted with or undermined the defense. Rather, such additional cross-examination would have strengthened Petrie's defense that the causal injury could well have occurred earlier. We therefore find that trial counsel's failure to cross-examine Dr. Davis on the basis for his opinion or object on the lack of foundation was "so irrational and unreasonable that no reasonably effective defense attorney, facing like circumstances, would pursue such a strategy." *Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 76     Petrie also argues that her counsel should have pressed Dr. Davis regarding the possibility that natural causes or accidental events could have caused R.N.'s subdural hematoma and brain swelling, which in turn caused his retinal hemorrhages. She notes that SBS is a diagnosis of exclusion, meaning that it may only be made once competing explanations for a child's injuries have been ruled out, and she cites publications finding that a variety of nontraumatic conditions can cause subdural hematomas, brain swelling, and lack of oxygen (hypoxia) to the brain. Most of the other possible causes listed in the literature that Petrie cites—congenital malformations, metabolic disorders, blood diseases, infectious diseases, vitamin deficiencies, and autoimmune conditions—were in fact ruled out here because there was no evidence of them, as even Petrie's own expert Dr. Scheller agreed. However, Petrie argues that counsel failed to acquaint himself sufficiently with brain injuries in infants to realize that alternate, accidental explanations for R.N.'s injuries existed and failed to present these possibilities to the factfinder.

¶ 77     Specifically, Petrie focuses on a possible accidental cause of R.N.'s brain swelling and hypoxia: a laryngospasm and sudden inability to breathe triggered by aspiration of his vomit. She cites one medical article and two cases that discuss the possibility that such an event could cause the hypoxic brain injury and swelling that Dr. Davis noted in R.N. Moreover, she argues, such an explanation would be consistent with the evidence here, including R.N.'s vomiting the night before, his sleepiness earlier on the morning of the seizure, his vomiting immediately before the seizure, and his difficulty breathing after the seizure. Her full theory is that R.N. received a skull fracture, and likely some brain bleeding and swelling due to that fracture, in the day or two before his seizure. However, the symptoms of that brain injury—the vomiting and lethargy—were not particularly noticeable until they were exacerbated by R.N.'s accidental aspiration of his own vomit at Petrie's home that morning, which triggered a laryngospasm, depriving his brain of oxygen and causing the seizure and further swelling. She argues that her counsel should have cross-examined Dr. Davis about this possibility and that counsel's failure to do so was ineffective assistance.

¶ 78     We agree that the record reflects that, although defense counsel realized the significance of certain facts, such as R.N.'s vomiting the night before, counsel did not demonstrate the

understanding of brain injuries in infants necessary to frame a cogent alternate explanation from those facts. Although Petrie emphasizes her counsel's failure to question Dr. Davis regarding this alternate possibility, we note that counsel also failed to advance the theory through Dr. Scheller's direct testimony. Moreover, counsel failed to realize and capitalize on the significance of Dr. Davis's concession that R.N. displayed hypoxic-ischemic brain injuries—*i.e.*, those caused by lack of oxygen to the brain—not the diffuse axonal injury that typically occurred in SBS cases. Thus, counsel missed the opportunity to point up findings that contradicted Dr. Davis's own explanations of R.N.'s injuries. While we do not require defense attorneys to train themselves as brain surgeons, in a case such as this, counsel must familiarize himself with the relevant scientific evidence and applicable theories to enable him to challenge the prosecution's expert witnesses and advance alternate explanations that are supported by the evidence. "The constitutional guarantee of effective counsel contemplates that, to render the trial a reliable adversarial process, counsel will *** appreciate and understand the legal principles applicable to the case." *Watson*, 2012 IL App (2d) 091328, ¶ 22; see also *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997). The failure to do so here falls below the threshold of constitutionally mandated assistance of counsel. Thus, the first prong of the *Strickland* test is met.

¶ 79                           2. Whether Defendant Was Prejudiced

¶ 80        The second prong of the *Strickland* test examines the actual prejudice to the defendant by her counsel's deficient performance. This inquiry asks whether there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Houston*, 226 Ill. 2d at 144. Absolute certainty is not required. Rather, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" (*Strickland*, 466 U.S. at 694), and a probability may be reasonable even if the chance of a different result is less than 50% (*People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008)).

¶ 81        Here, the trial court explicitly based its finding of guilt on Dr. Davis's opinion that the causal injury must have occurred immediately before R.N.'s seizure. It relied almost wholly on this opinion in finding that Petrie was the person who caused R.N.'s injuries. However, there was substantial medical literature calling this opinion into question and documenting its opposite: that lucid intervals have been observed in children with injuries similar to R.N.'s. In addition, there was other evidence undermining Dr. Davis's conclusions, including R.N.'s vomiting the night before, suggesting that his subdural hematoma and some brain swelling may already have been present, and the fact that his fragile healing rib fracture had not been reinjured, suggesting that he had not been shaken. Thus, there is a reasonable probability that, if defense counsel had cross-examined Dr. Davis on the foundation for his opinion in light of contrary studies, Dr. Davis's certainty and credibility could have been lessened, leading to a different outcome.

¶ 82        The State argues that any prejudice was minimal, because defense counsel presented the testimony of Dr. Scheller, who rebutted Dr. Davis's opinion and cited both medical literature and his own experience to support his opinion that R.N. suffered a traumatic head injury and could well have had a lucid interval. Petrie responds that, even where a contrary expert opinion is offered, such a conflict simply requires the trier of fact to decide which expert to believe, and so exposing the lack of support for one expert's opinion is still vital. See *People v. Houseworth*, 388 Ill. App. 3d 37, 52 (2008) (where the central issue at trial is the subject of

conflicting expert testimony, the trier of fact must choose which is more credible, and "the weight given to an expert's opinion is measured by the stated reasons and the factual details supporting the conclusion").

¶ 83    The State also argues that some studies support Dr. Davis's opinion and that, if questioned about the basis for his opinion, Dr. Davis might well have responded by citing those studies. In that case, it argues, Dr. Davis's opinion would not have been undermined through such cross-examination, and there is no probability that the outcome would have been different. This argument enters the realm of speculation, guessing how Dr. Davis would have responded if he were questioned about the bases for his opinions. Moreover, even assuming that Dr. Davis could cite professional literature supporting his opinion and explain why he did not accept the contrary studies, the very act of requiring him to do so would communicate to the trial court that his opinion was the subject of debate in the medical community. Defense counsel's failure to even suggest that this debate existed was unprofessional error and, taken with the trial court's reliance on Dr. Davis's unchallenged opinion to find Petrie guilty, was prejudicial to Petrie. See *Strickland*, 466 U.S. at 694 (a reasonable probability of prejudice is simply "a probability sufficient to undermine confidence in the outcome"). Accordingly, we must reverse her convictions.

¶ 84    Because we are remanding this cause for a new trial, we must consider whether the evidence was sufficient to sustain Petrie's conviction beyond a reasonable doubt. *People v. Jiles*, 364 Ill. App. 3d 320, 330-31 (2006). The double jeopardy clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence that it failed to muster in the first proceeding. *Id.* at 331. However, it does not preclude retrial if the evidence introduced at trial was legally sufficient to convict but the conviction must be set aside because of errors in the trial process. *Id.* (citing *People v. Olivera*, 164 Ill. 2d 382, 393 (1995)). "Evidence is sufficient when a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could find that the essential elements of the offense were proven beyond a reasonable doubt." *Id.* (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). Given the closeness of the evidence, we find that this standard is met here.

¶ 85                                   III. CONCLUSION

¶ 86    The judgment of the circuit court of De Kalb County is reversed, and the cause is remanded for a new trial.

¶ 87    Reversed and remanded.