**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190578-U

Order filed June 1, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0578 Circuit No. 18-CF-37 |
| CLEMENT J. KOBISCHKA, | ) ) ) | Honorable Michael D. Risinger, |
| Defendant-Appellant. | ) | Judge, Presiding |

_____

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Daugherity and McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  Evidence was insufficient to sustain defendant's conviction for aggravated battery to a child.

¶ 2     Defendant was found guilty by a jury of aggravated battery to a child and sentenced to a 20-year term of imprisonment. He appealed. We reverse his conviction.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant Clement J. Kobischka was charged with aggravated battery to a child (720 ILCS 5/12-3.05(b)(1) (West 2020)), for allegedly inflicting injuries to his seven-month-old daughter, K.H., while she was in his care. A jury trial took place.

¶ 5        Kelsey testified that she was the mother of four daughters: Skylynn, who was 12 years old; Ireland, who was 11 years old; Bella, who was 4 years old, and K.H., born May 17, 2017, who was 1½ years old. Defendant was Kelsey's boyfriend and K.H.'s father. Kelsey worked as a home health aide during the week and as a gas station attendant on Saturdays and Sundays. Her children went to day care during the week. Kelsey's aunt, Mary Hoyle, provided day care for the three older girls during Kelsey's weekend shifts and defendant would watch K.H.

¶ 6        On December 30, 2017, Kelsey was scheduled to work at the gas station from 2 to 10:30 p.m. She dropped all four girls at Mary's house. She did not recall if her uncle, Bart Hoyle, was home. After her shift, Kelsey picked up the girls and returned home. She could not recall if defendant spent the night. The following morning, Mary picked up Skylynn and Ireland at 8 a.m. for church, as was the usual practice. K.H. was her normal self but had an upper respiratory virus and was "a little bit fussy" with a runny nose. She was eating normally and not throwing up. K.H. generally napped twice a day for 20 to 90 minutes around 12 to 2 p.m. and 5 to 6 p.m. The short naps "would be [the result of] her sister jumping in the crib singing her the ABC's." That morning, Kelsey and defendant exchanged text messages and Kelsey sent him a picture of herself and K.H.

¶ 7        Defendant arrived at Kelsey's house around 1:30 p.m. to watch K.H. while Kelsey worked. K.H. was asleep when Kelsey left for work. She dropped the three older girls at Mary's house, where they were going to spend the night. When Kelsey returned home at 10:40 p.m., K.H. was sleeping but soon after started crying. Defendant checked on her and K.H. then "puked

2

everywhere." Kelsey said that K.H. had not thrown up like that before, characterizing it as projectile vomiting.

¶ 8        K.H. slept through the night but when Kelsey awakened her on the morning of January 1, she vomited again. Kelsey tried to feed K.H. a bottle but she could not keep the formula down. Kelsey did not know why K.H. was vomiting but did not want to go to the doctor because "you never know" what is wrong. She described that K.H. was not her usual self; she was not moving or rolling around or babbling. Kelsey described that K.H. was "just kind of not there." Kelsey went to work from 9 a.m. to 2:30 p.m. while defendant stayed with K.H. When Kelsey returned home, K.H. was asleep. Defendant left and the other girls came home around 3 p.m. K.H. was still not acting like herself. She was sleeping more than normal. Kelsey tried to feed K.H. with a bottle but she continued to vomit. Kelsey texted defendant at 5:43 p.m., stating that K.H. had vomited on her. Defendant replied, "Oh my God, that's exactly what happened last night. I had so much liquid I had to take a shower and wash my hoodie. I think it's because of the phlegm and maybe not burping after a bottle." Kelsey texted pictures to defendant to show him K.H. was lethargic. She did not call the doctor because she thought K.H.'s symptoms were connected to her upper respiratory condition.

¶ 9        On January 2, Skylynn and Ireland brought K.H. to Kelsey as Kelsey was waking up, complaining that K.H. was fussy and not her normal self. K.H. was lethargic and still vomiting. Kelsey called the gas station to inform them she would not be in to work. She planned to take K.H. to the doctor. At some time between noon and 2 p.m., Kelsey laid K.H. on the couch and left the room. Her other girls yelled to her and she ran back in and saw K.H. was having a seizure. She then took K.H. to the emergency room (ER). K.H. had another seizure at the ER. Tests indicated K.H. had skull fractures, subdural hematomas, retinal hemorrhages, and "possibly shaken baby

3

syndrome." K.H. had a bruise on her foot, which Kelsey said happened when Kelsey accidently stepped on her and a bruise on her left knee from an unidentified source. Kelsey denied that she hurt K.H. but she said K.H. rolled off the bed a few times although those incidents did not occur near December 31. The first time K.H. appeared to have more symptoms than just a runny nose was the night of December 31, 2017. Kelsey texted defendant to join them at the hospital and informed him that K.H. had skull fractures. The text exchanges between Kelsey and defendant were admitted into evidence. Kelsey called her older daughters and asked if they knew whether something had happened to K.H. She also called defendant and Mary. Law enforcement questioned her several times during K.H.'s week-long hospital stay. She told them she did not believe defendant would have hurt K.H. Since her release from the hospital, K.H. has not had any seizures or related medical problems.

¶ 10    On cross-examination, Kelsey said K.H. had had a cold for a week or two before the initial seizure occurred. K.H.'s nose was runny, her chest was congested and she had a cough. She was fussy and whiny unless Kelsey held her. Kelsey did not take K.H.'s temperature but her body felt normal. Kelsey treated K.H. with "Tylenol for teething" but did not take K.H. to the doctor. Mary provided day care for all the girls on December 30 and Ireland spent the night at Mary's house. The next morning, Skylynn went to church with Mary and Ireland, with the girls returning home around 12:30 p.m. Kelsey did not check on K.H. when she returned from work on December 31 and could not recall telling a detective that she did check on her, noticed her congested breathing, and turned on the humidifier. When K.H. started fussing, defendant checked on her and Kelsey heard K.H. vomit. Kelsey told Detective Keen at the hospital she did not know what happened to K.H. but it was possible that one of her other children might have accidentally hurt their sister. The older girls kickboxed and sometimes held K.H. while they did. She had intervened on a prior

4

occasion and taken K.H. from them as they roughhoused. The other children were supposed to be sitting down if they held K.H but Bella was not allowed to hold or carry her. She never saw Bella pick up K.H.

¶ 11        On redirect examination, Kelsey said that before December 31, K.H. was not eating differently or throwing up but she was sleeping more than usual and acted lethargic. She did not play with her toys, which she usually did. Rather, she slept or needed to be held by Kelsey. She then clarified that she was talking about K.H.'s behavior after December 31. Prior to December 31, K.H. was sleeping normally. On the morning of January 1, Skylynn and Ireland took K.H. out of her crib and brought her to Kelsey. She allowed them to take K.H. out of the crib. They also carried her around the house, which she did not like but also allowed. She never saw Skylynn or Ireland drop K.H.

¶ 12        Skylynn testified that she was 12 years old and in the seventh grade. She was in the sixth grade when K.H. was hurt. K.H. was not acting normal the day she went to the hospital. K.H. was "staring off" and "not really responding a lot." She saw K.H. have a seizure that day. She was familiar with seizures because her dad and grandmother were both epileptic. She did not see anything that would have hurt K.H. or made her sick. She did not see K.H. fall or anyone drop her. She had never seen anyone drop K.H. but K.H. fell off the couch several months earlier. She did not see her mother hurt K.H. She and Ireland would play fight but they did not hurt K.H. They did not hold or hurt K.H. when they kickboxed. There were rules that she and her sisters should not pick up K.H. and carry her around but they could sit on the couch and hold her. They would carry K.H. around but not when she was "really tiny." On cross-examination, she clarified K.H. would be in the same room when the older girls roughhoused. She denied that she or Ireland ever held K.H. while they engaged in play fighting. She did not recall that at her interview at the Children's

5

Advocacy Center (CAC) she said K.H. was not hurt when she and Ireland roughhoused but that at the most, K.H.'s foot would have hit the couch. On redirect examination, Skylynn said that she and Ireland had not kickboxed in the days immediately preceding the occurrence of K.H.'s injury.

¶ 13          Ireland testified she was 11 years old and in the fifth grade. K.H. was not acting normal the day she went to the hospital. K.H. was not smiling or laughing but she was vomiting. She was on the couch with Skylynn and K.H. was laying between them when K.H. had a seizure. Ireland denied accidentally hurting K.H. She did not see anything happen that would have harmed K.H. There were rules about carrying K.H. when she was a baby; they were to sit down to hold her but could stand up and rock K.H. if she was fussy. She and Skylynn kickboxed in their bedroom. The only time K.H. was around that activity was when K.H. would walk by them and accidentally run into Ireland or knock her in the shoulder. Before K.H. could walk, she was never around her and Skylynn when they roughhoused. On cross-examination, she denied she or Skylynn ever held K.H. while they kickboxed. She did not know of any fall K.H. might have had before the incident at issue but she had fallen since then.

¶ 14          Mary Hoyle testified. She frequently babysat for her niece Kelsey's children on the weekends when Kelsey worked at the gas station. All four girls would come over, although she sometimes split childcare duties with the children's adopted grandmother, Nary Olt. Other times, defendant would care for K.H. during Kelsey's Sunday shift and Mary cared for the other girls. Mary's husband, Bart, with whom the girls were close, would help her babysit. She babysat for all four girls on December 30, 2017. Her 10-year-old grandson also came over that day. Bart was working a 12-hour shift at a new job, arriving home around 8:30 p.m. He went straight to bed. K.H. was not exhibiting any symptoms with no signs of illness or injury, aside from a small bruise on her foot. She had three bottles throughout the day and did not throw up or spit up. She was very

6

active, scooting around the house. No one was alone with K.H. that day, except while K.H. was napping in a bedroom.

¶ 15 Mary described K.H. as an active baby, who was usually fussy in the evenings. She did not nap well and sometimes would only sleep a few minutes at a time. K.H. napped awhile after each of the three bottles she had taken. One time she fell asleep in Mary's arms and after her third bottle around 8:30 p.m., K.H. fell asleep in a bed with a guardrail and remained sleeping until Kelsey took K.H., Skylynn and Bella home after her work shift. Ireland spent the night with Mary, and they attended church and went to lunch the next day. Her grandson also attended church with them. Around 1:30 p.m. on December 31, Kelsey dropped off Skylynn and Bella at Mary's house. The three girls spent the night and stayed until around 3 p.m. on January 1. Kelsey called her on January 2 and said she was taking K.H. to the hospital. Kelsey was upset. Mary still provides childcare for all four of Kelsey's daughters on the weekends. Mary did not hurt K.H and did not know anyone who would.

¶ 16 Bart Hoyle testified. Kelsey is his niece and he and his wife babysit her children so she can work. He estimated he last saw K.H. a week prior to her hospitalization. In late December 2017, early January 2018, he had just started a job as a security guard and was on call. His first day was December 30 and he worked from 8 a.m. to 8 p.m. When he arrived home from work, he lay down. He could not remember if Mary watched Kelsey's children that day. He was not aware of any unusual events in the days prior to K.H.'s hospitalization. He did not talk to law enforcement after K.H. was injured.

¶ 17 City of Pekin Detective Danielle Keen testified. She was specially trained to investigate child abuse allegations and was the lead detective on K.H.'s case. She responded to OSF Hospital on January 3, 2018, and spoke with the investigator, Matt O'Marrah, from the Illinois Department

7

of Children and Family Services (DCFS). O'Marrah participated in her subsequent interviews with both Kelsey and defendant. Keen also spoke to medical personnel before and after she talked to Kelsey and defendant. She was aware K.H. had sustained two skull fractures and subdural hemorrhaging before she talked to K.H.'s parents. She interviewed Kelsey in K.H.'s hospital room. Kelsey laid out a timeline leading up to K.H.'s hospitalization focusing on events beginning December 30. After speaking to Kelsey, Keen interviewed Dr. Channing Petrak. She then interviewed defendant who also provided a timeline. Defendant did not see K.H. on December 30. He told Keen that he stayed with K.H. on December 31 and was alone with her between 2 and 10:30 p.m. She had cold symptoms, including coughing, but no significant health issues. K.H. threw up around 11 p.m. after Kelsey returned home from work. Defendant stayed at Kelsey's the night of December 31, and on January 1, K.H. vomited after her feedings. He cared for her again on January 1, from 10 a.m. to 2:30 p.m. He was alone with K.H. during that time. Keen implied during the interview that defendant must have done something to injure K.H. while she was in his care, that he must have become frustrated and hurt her. Defendant denied the implications. He said K.H. did not fall, hit her head, or become injured in some other way while in his care. He did not shake K.H., drop her or hit her and nothing had fallen on her. He consistently denied hurting K.H. and he did not see Kelsey hurt K.H. When Keen told defendant K.H. had a skull fracture and brain bleed, he appeared shocked.

¶ 18        Both defendant and Kelsey agreed to allow law enforcement to download the contents of their phones and Kelsey consented to a search of her house. Keen also interviewed Mary and Petrak and reviewed medical records. She interviewed Skylynn, Ireland and Bella at the CAC and the interviews were video and audio recorded. Portions of Ireland's CAC interview was played for the jury. Keen did not interview Bart.

8

¶ 19 Dr. Edward Hu testified. He was an expert in ophthalmology. He was regularly called to the hospital to examine children for possible child abuse. He examined K.H. for non-accidental trauma on January 3, 2018. Her eyes were normal externally but the retina of her right eye was bleeding and he observed evidence of bleeding at all levels to the left eye retina and eye nerve. Retinal hemorrhages are not common in children. He explained that to cause a retinal hemorrhage in a child, a substantial amount of force would be required. Administering CPR or often even a vehicle accident would not generate sufficient amounts of force to cause retinal hemorrhaging. According to Hu, one of his medical school professors would say "that the force generated roughly would be the equivalent of falling from a 10-story building." Shaking a baby back and forth or blunt force trauma to a child would cause a retinal hemorrhage. While retinal bleeding could be caused by a variety of things or by regular injuries, hemorrhaging in all layers of the retina is "associated" with shaken baby syndrome. His findings were consistent with shaken baby syndrome and inconsistent with a fall from a small distance. In his opinion, "[a]n extreme amount" of force was necessary to cause K.H.'s injuries. He estimated hemorrhaging would occur a day after a trauma occurs. The hemorrhages could last for days, weeks, months or years after the trauma that caused them. It was "possible" that K.H.'s hemorrhages occurred four days earlier. He did not believe K.H.'s injuries would result in vision loss. In his opinion, the findings regarding K.H.'s injuries were consistent with non-accidental trauma and inconsistent with any other cause.

¶ 20 On cross-examination, Hu explained that he generally does not review reports before examining a patient when asked to determine whether there was non-accidental trauma so that he was not biased in making his diagnosis. He acknowledged that retinal hemorrhaging could be caused by accidental trauma but would generally exclude it based on the clinical story he was provided. He did not have a clinical story for K.H. as he opted not to review the reports per his

custom. However, Hu ruled out the possibility of accidental trauma based on the extent of K.H.'s injuries, although he agreed that blunt force trauma could be accidental. It was not necessary for him to know whether K.H. suffered a blunt force trauma. He could not comment on the mechanism of the non-accidental trauma in K.H.'s case and could only comment on the retinal findings. The findings indicated only that a severe injury occurred and nothing more. He could not put a date on when the injury occurred. Because of the extensive amount of force necessary to cause K.H.'s injuries, it would be possible that there was evidence of other injuries to her.

¶ 21　　　　On redirect examination, Hu said that to a reasonable degree of certainty, K.H.'s injuries could not have resulted from blunt force trauma from a short fall, a fall from a piece of furniture or being dropped by someone.

¶ 22　　　　Dr. Channing Petrak testified. She was the medical director of the Pediatric Resource Center (PRC) at the University of Illinois medical school in Peoria and an expert in the field of child abuse pediatric medicine and abusive head trauma (AHT). The PRC is designed to evaluate children for abuse and neglect. Cases are referred to PRC when child abuse or neglect are suspected. She diagnoses child abuse in about 40% of the cases and in the other 60% of cases, she finds no abuse or neglect or cannot determine if they occurred. She explained that AHT is a diagnosable medical condition that consists of a "constellation of injuries to a child's head that are abusive in nature." AHT includes shaken baby syndrome but is more encompassing. AHT falls along a spectrum and can be mild resulting in concussion-like symptoms such as lethargy, irritability and poor feeding. More severe symptoms may include vomiting, seizures, head bleed, apnea and death. The symptoms can progress but seizures are generally not the first sign of injury. Skull fractures are not always present in AHT or a sign of it. A child could sustain a skull fracture from a fall with a small intercranial hemorrhage but would be asymptomatic and all the injuries

10

would be located at the place of impact. Injuries Petrak commonly sees with AHT include bleeding, such as subdural hemorrhages, brain tissue injury, brain or scalp swelling, skull fractures and retinal hemorrhages. The type of force necessary to cause subdural hemorrhages cannot be calculated but "it's nothing that is normal care, so it's well beyond forces that would be normal care, or even accidental injuries that would cause those bridging veins to tear and cause a subdural [hemorrhage]." A child could have a subdural hemorrhage without any external bruising.

¶ 23    Petrak evaluated K.H. at the hospital on January 2, 2018. She saw a bruise on K.H.'s left foot, which Kelsey told her she caused by accidently stepping on K.H. There was concern about a possible fracture but a follow up skeletal survey did not show a fracture. Petrak did not recall seeing and did not document a bruise on K.H.'s left knee. CT imaging showed K.H. suffered an extensive parietal skull fracture on the right side of her head. Such a fracture is a common injury resulting from a fall from a changing table, for example. Skull fractures can be present in abusive head trauma but could also be the result of accidental drops. In those circumstances, however, the children are usually asymptomatic without lethargy, vomiting or the presence of subdural hematomas. K.H. also had a fracture in the occipital bone. The two fractures were not connected which indicated two different impacts to K.H.'s skull. The imaging further showed subdural hemorrhages in multiple areas on the left side of K.H.'s head. The hemorrhages were not underlying the fractures, indicating the fractures did not cause them.

¶ 24    In Petrak's opinion, her findings suggested both an acceleration and deceleration injury and an impact injury. As a result of the injuries, she would expect K.H. to exhibit symptoms such as lack of appetite, increased sleep, vomiting, and acting fussy, irritable, and lethargic. Petrak would expect some symptoms to appear immediately, but they could be progressive with other symptoms manifesting later. She would not expect a child with K.H.'s injuries to appear normal

11

for eight hours after the injuries were inflicted. She anticipated that K.H. would experience lasting health consequences from her injuries. In her medical opinion, K.H.'s injuries were not consistent with a short fall or drop but resulted from abusive head trauma.

¶ 25    On cross-examination, Petrak said there is no way to measure the amount of force necessary to cause injuries by shaking. Petrak agreed that skull fractures could result from an accident and a young child was more likely to sustain a fracture from a fall or from bumping into something than an adult. She expected that K.H. would have experienced lethargy, irritability or vomiting before the seizure and that the seizures would start hours but probably not days after the injury. She did not see any bruises on K.H. besides the one on her foot. There were no bruises on K.H.'s arms, chest or the sides of her torso, and no hand or finger impressions. K.H. had full range of motion in her neck and Petrak did not notice K.H. experience pain when her head was moved or during the spinal examination. A skeletal survey of the spine was normal. K.H. had normal range of motion in her arms and legs and normal muscle tone. On redirect examination, Petrak said that seizures in infants may be subtle and can increase in severity as the injury progresses without being treated.

¶ 26    Dr. Erika Switzer-Hunter testified that she was K.H.'s pediatrician and conducted all her doctor visits since her birth. K.H. did not have any medical issues prior to January 2018. At the time of trial, K.H. was in good health and developing well but it was impossible to predict if K.H. would experience long-term effects from her injuries. Based on a review of K.H.'s medical records, she agreed with the diagnoses and information they contained.

¶ 27    The State rested and defendant called Ireland to testify. She said her three-year-old sister Bella would sometimes carry K.H. in a bear hug. She denied that Bella fell one time while carrying K.H., causing K.H. to bang her head on the kitchen floor. She agreed she told Keen "something

12

like that" but said there were two incidents about which she told Keen. One time Bella was holding K.H. in the living room, K.H. fell backwards and Skylynn caught her before she fell. A second incident occurred when Bella slipped, fell and hit her head on the kitchen floor. K.H. was not present.

¶ 28 The defense also called Keen. She acknowledged that she interviewed Ireland at the CAC and the interview was recorded. The applicable portion of the interview between Keen and Ireland were played for the jury and showed that Ireland told Keen about the two falls, one where Skylynn caught K.H. and one where Bella hit her head on the kitchen floor. Keen admitted she did not include anything in her report about the two falls Ireland mentioned. On cross-examination, Keen explained that she interpreted Ireland's comments to mean Bella fell, not K.H.

¶ 29 The State recalled Ireland, who explained Bella fell running in the kitchen. K.H. was not with her. The State rested.

¶ 30 Following deliberations, the jury convicted defendant of aggravated battery to a child.

¶ 31 Defendant filed a posttrial motion based on an affidavit submitted by Tawny Fuller in which she attested that Kelsey told her at a party that she, not defendant, injured K.H and that she implicated defendant because she was angry he was cheating on her. A hearing took place on the motion. Fuller and the party's host both testified for defendant and an investigator for the Tazewell County State's Attorney's Office and Kelsey testified for the State. The trial court denied the posttrial motion and sentenced defendant to a 20-year term of imprisonment. He appealed.

¶ 32                                                    II. ANALYSIS

¶ 33 Kobischka raises two issues on appeal. He challenges whether the State proved him guilty of aggravated battery of a child beyond a reasonable doubt and whether he was denied effective assistance of counsel.

13

¶ 34    We begin with Kobischka's argument that the evidence presented by the State was insufficient to sustain his conviction for aggravated battery of a child. Defendant argues that no reasonable trier of fact would have found beyond a reasonable doubt that he injured K.H. He asserts that K.H. had symptoms consistent with a head injury prior to December 31 when she was alone in his care and that the skull fractures were consistent with accidental trauma. He further argues that Hu and Petrak did not support their testimony that K.H.'s injuries were caused by shaking and that their opinions are not aligned with other findings, and that the evidence does not support that he knowingly inflicted great bodily harm on K.H.

¶ 35    A person at least 18 years old commits aggravated battery to a child when "in committing a battery, he *** knowingly and without legal justification by any means: (1) causes great bodily harm *** to any child under the age of 13 years." 720 ILCS 5/12-3.05(b)(1) (West 2016). "A person commits battery if he *** knowingly without legal justification by any means (1) causes bodily harm to an individual ***." 720 ILCS 5/12-3(a)(1) (West 2016). "A person knows, or acts knowingly or with knowledge of: (b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2016). In child abuse cases, the element of intent or knowledge is generally established by circumstantial evidence, not direct proof. *People v. Rader*, 272 Ill. App. 3d 796, 804 (1995). Intent may be inferred from "(1) from the defendant's conduct surrounding the act and (2) from the act itself." *People v. Klein*, 2015 IL App (3d) 130052, ¶ 102 (citing *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009)).

¶ 36    When determining the sufficiency of the evidence, the reviewing court must decide whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact would find the State proved the defendant guilty beyond a reasonable doubt. *People v. Collins*,

14

106 Ill. 2d 237, 261 (1985) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Vriner*, 74 Ill. 2d 329, 342 (1978). Our review of the evidence leaves us with a reasonable doubt as to defendant's guilt. This conclusion is based on the timeline of K.H.'s symptoms, as well as the opportunities that existed for accidental injury to occur.

¶ 37    Kelsey's testimony established a timeline of K.H.'s symptoms demonstrating that K.H. had not been feeling well prior to December 31. Kelsey testified that K.H. had been suffering from a cold for a week or so and was fussy and lethargic and wanted Kelsey to hold her. She was treating K.H. for teething with Tylenol. She did not think K.H.'s symptoms warranted a trip to the pediatrician. Kelsey said K.H. was fussy with a runny nose on December 30. Mary cared for all four girls while Kelsey worked that day. Mary described that K.H. was acting normal and had only a small bruise on her foot. She drank a full bottle of formula at 3 p.m. but only finished half of her 5:30 p.m. bottle. K.H. napped just a few minutes after the first two bottles. K.H. generally napped anywhere from 20 minutes, if her sisters interrupted her, to 90 minutes, according to Kelsey, although Mary indicated K.H. was not a good napper. The fussiness and lethargy K.H. was exhibiting and the short naps and decreased appetite at Mary's house on December 30 suggest K.H. could have been suffering symptoms of a head injury at that time.

¶ 38    That conclusion is further buttressed with the fact that after K.H. had the third bottle around 8:30 p.m., she slept until after 10:30 p.m., when Kelsey picked her up. Text messages between Kelsey and defendant sent shortly after 9:30 a.m. on December 31 establish that K.H. was in bed with her mother. Kelsey did not indicate to defendant in the texts that K.H. had been up during the night. Thus, on the morning on December 31, before defendant saw K.H., she was still in bed

15

hours after she lay down at Mary's house, indicating K.H. was lethargic at that time, in addition to being fussy and irritable, all of which could have been early symptoms of AHT, as explained by Petrak. Neither Petrak nor Hu could pinpoint when the injury took place. Hu said retinal hemorrhages could last for days, weeks, months or years after the trauma that caused them. He could not rule out that K.H.'s injuries took place four days prior to his exam of her on January 3, 2018, suggesting the possibility of injury on December 30. Petrak would expect to see symptoms immediately, including increased sleep, fussiness, poor appetite, vomiting and abnormal behavior. She said the seizures would generally take place hours, not days, after an injury, and although they could be subtle, they would increase in severity. The evidence leaves us with a reasonable doubt that K.H. was injured on December 31 when she was in defendant's care.

¶ 39     We also conclude that it was possible that K.H.'s injuries were accidentally inflicted. The evidence presented a number of scenarios in which K.H. could have been injured without intentional conduct. Kelsey initially expressed concern to Keen that K.H.'s sisters could have accidently hurt her. Kelsey explained that K.H.'s short naps were the result of her sisters jumping into K.H.'s crib "to teach her the ABC's." Skylynn, Ireland and Bella carried K.H. around despite their mother's rule they not do so. Skylynn and Ireland kickboxed and generally roughhoused together sometimes when K.H. would be present in the room. In her CAC interview, Ireland related that K.H. fell backwards when Bella was holding her but Skylynn caught K.H. before she landed. Kelsey, Skylynn and Ireland all testified that K.H. had fallen off the couch and the bed at some point. On December 30, while at Mary's house, K.H. was scooting along the hallway and "was all over the place doing that." These incidents suggest an environment filled with activity and energetic children where an accidental injury could have taken place unnoticed.

16

¶ 40　　　　In addition, the circumstances surrounding the family's activities between December 30, 2017, and January 2, 2018, are unclear. There are discrepancies concerning who was where and when. Kelsey could not recall if defendant spent the evening on December 30. He said he did not. Bart could not recall if the girls were at his home that day. He spent the day at a new job and apparently went to bed immediately upon returning home. Mary stated she watched all four girls that day, although she often split weekend caretaking duties with the girls' adopted grandmother, a fact Kelsey never disclosed. According to Kelsey, defendant watched K.H. while she worked her weekend shifts at the gas station. Further discrepancies arose in the timeline. According to Kelsey, Mary picked up Skylynn and Ireland for church on December 31 while Mary said that Ireland stayed overnight at her house and she took Ireland and her grandson to church and lunch. There was no mention of Skylynn. Kelsey said that Skylynn and Ireland were both brought home around 12:30 p.m. and an hour later she dropped all three girls at Mary's house on her way to work. Mary, however, recalled that Kelsey only dropped off Skylynn and Bella. These discrepancies contribute to the environment in which K.H. was injured. Based on the facts presented, it is unclear who was home with K.H., on what days and during what times. As mentioned above, K.H. lived in an active home with Kelsey working different shifts during the week and weekend and K.H.'s sisters coming and going between various caretakers. In our view, these circumstances resulted in numerous opportunities for injuries to be inflicted, intentionally or accidentally, by a handful of different people who were around K.H.

¶ 41　　　　The possibility K.H. was accidentally injured is further supported by the medical testimony. Both medical experts testified that an extreme amount of force intentionally applied was necessary to cause K.H.'s internal head and eye injuries but neither of them testified to any external impact or other external injuries to K.H. She had no bruises anywhere on her body aside

from her foot and knee. There were no fingerprint or handprint impressions. K.H. had a full range of motion in her neck, arms and legs. Her spine was normal. K.H. had no impact injuries, facial injuries or external injuries to her eyes, as are common in AHT. She did not have brain tissue injury, or brain or scalp swelling, also common AHT injuries. Both medical experts examined K.H. with the sole aim to determine whether her injuries were intentionally caused. Petrak said she would not examine a child without an indication of possible abuse. Hu said he would generally rule out accidental trauma based on the clinical story he was provided but he chose to forego a clinical story so to avoid biasing himself prior to examining K.H. He agreed that there could be other causes for retinal hemorrhaging in pediatric cases, for example, accidental trauma. Neither Petrak nor Hu could determine when the injury occurred or how.

¶ 42    We further determine that the State did not prove that defendant knowingly injured K.H. In our view, the circumstantial evidence does not implicate defendant as the knowing perpetrator of K.H.'s injuries. Defendant's conduct does not support a conclusion that he injured K.H. He denied doing anything to hurt her. When she awoke crying on December 31 after Kelsey returned home from work, he checked on her and did not attempt to hide the fact that she vomited. He did not rush home in an attempt to separate himself from a supposedly injured child. Rather, he spent the night and cared for K.H. the following day. When Kelsey texted him about K.H. vomiting on her, he emphasized the fact that he experienced her extreme vomiting as well. When defendant arrived at the hospital, he willingly spoke to Keen. During that interview, he consistently denied abusing K.H., despite Keen's repeated accusations that he must have injured her.

¶ 43    The conclusion that K.H.'s injuries were non-accidental does not establish that the defendant knowingly perpetrated injury on K.H. Although both medical experts concluded K.H.'s injuries were non-accidental, neither expert could pinpoint when or how K.H.'s injuries occurred.

18

There were two separate and unconnected fractures and subdural hemorrhages that were also separate from the fractures and not caused by the same impact. There were multiple opportunities between December 30 and January 2 where K.H. could have sustained her injuries. As discussed above, she was active and "all over the place" on December 30 at Mary's house. Her three sisters, Mary and Bart and their grandson, were also present. On December 31, K.H. was home with at least one of her sisters and her mother prior to defendant's arrival in the early afternoon. Kelsey, Mary, Skylynn, Ireland and defendant all denied injuring K.H. or seeing anything that would have caused her injuries. There were no external injuries establishing the source of the internal injuries, which were limited solely to K.H.'s brain and eyes. While the State established the result of alleged abuse, it did not establish any act of abuse or that defendant perpetrated it.

¶ 44 Based on the foregoing, we find the State failed to prove defendant guilty beyond a reasonable doubt and reverse his conviction outright. Because we find this issue dispositive, we will not address defendant's ineffective assistance of counsel claim.

¶ 45                                  III. CONCLUSION

¶ 46 For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed.

¶ 47 Reversed.