2023 IL App (2d) 220354-U
No. 2-22-0354
Order filed August 30, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-106 |
| BRIAN CLEMENTE, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The evidence was sufficient to sustain defendant's conviction, and the claim of ineffective assistance of counsel is better suited for collateral review. Affirmed.

¶ 2   Defendant, Brian Clemente, appeals from his conviction of aggravated battery (720 ILCS 5/12-3.05(b)(1) (West 2022)). He contends that the State failed to prove him guilty beyond a reasonable doubt because the circumstantial evidence failed to show he caused S.C.'s injuries. He also argues that trial counsel provided ineffective assistance by failing to call an expert witness regarding shaken baby syndrome. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4    On January 10, 2021, defendant was charged with aggravated battery of a child under age 13, and aggravated domestic battery. 720 ILCS 5/12-3.05(b)(1), 3.3(a) (West 2022). The State alleged that he knowingly caused great bodily harm to S.C., his two-month-old infant, by striking and shaking her. After a bench trial, defendant was found guilty of both offenses and sentenced to 12 years' imprisonment for aggravated battery of a child under 13.

¶ 5    The evidence at trial showed that, on January 9, 2021, defendant; his sister, Anelly Dominguez; his girlfriend, Jasmine Vargas; his father, Manuel Clemente; and his daughters, S.C. and G.C., were all living at 727 North Avenue in Aurora. Jasmine testified that, in the afternoon, she and defendant drove to Walmart to purchase Hennessy and a board game. The two planned this evening together to rekindle their relationship because defendant recently discovered that Jasmine met someone else while enrolled in a drug rehabilitation program. This discovery led defendant to question the paternity of S.C.

¶ 6    After returning from Walmart, Jasmine recalled being with the children in the kitchen and someone feeding S.C. a bottle. Jasmine and defendant began taking shots of Hennessy and playing Monopoly around 9 or 10 p.m., while S.C. was asleep and uninjured in her bouncer. Eventually, defendant and Jasmine left the children downstairs to go upstairs to smoke cannabis. Jasmine does not recall if Manuel was awake when they left the children downstairs. Sometime that evening, Anelly testified that she saw defendant and Jasmine talking in the kitchen; the children were not present and were quiet throughout the night.

¶ 7    About an hour into their game, Jasmine got a call from the man she met at the drug rehabilitation facility. She gave defendant the phone, and defendant threatened the caller. Defendant remained upset after the call. At this point, half the bottle of Hennessy remained. Around 11 p.m., Jasmine took the children upstairs to bed to avoid further conflict. Defendant

stated in his interview that he followed Jasmine upstairs and they continued to argue. Jasmine laid S.C. down in her Pack 'n Play. She did not notice anything wrong with S.C. Jasmine believed that defendant would change and feed S.C. before she fell asleep, so Jasmine laid down with G.C. and, eventually, fell asleep between 11 p.m. and midnight. Manuel left the house for work between midnight and 1 a.m. Around 2 a.m., defendant took both children downstairs to sleep in Manuel's room with him. He stated that neither child was injured when he moved them.

¶ 8    Later that evening, Anelly's boyfriend, Selby, called and stated that he planned to come over. Around 3 a.m., Selby arrived. Shortly thereafter, Anelly testified that she heard footsteps coming from defendant's room upstairs. Anelly then heard defendant running down the stairs, calling her name, and asking for help. Defendant sounded very scared.

¶ 9    Jasmine recalls waking up at 4 a.m. to defendant screaming her name downstairs. She met him at the top of the stairs, where he was crying and telling Jasmine he was sorry. Defendant indicated to Jasmine that the children were fine, but he was apologizing for their earlier dispute. Jasmine believed she heard one of the children crying downstairs, so she and defendant returned to Manuel's room. Jasmine located the children and stated that they were not crying. Defendant proceeded to the basement and was heard saying, "go away, go away." Jasmine did not know if anyone else was in the basement.

¶ 10    Thereafter, Jasmine heard S.C. gasping, so she turned on the bedroom lights. Jasmine discovered S.C. in the middle of the bed covered in bruises, gasping for air, and bleeding from her nose and mouth. G.C. was also asleep on the bed but did not have any injuries. Jasmine started screaming, and defendant returned from the basement. She asked defendant what happened, and he stated that he "didn't do it." Jasmine was afraid to touch S.C. because she was stiff, and she believed all S.C.'s bones were broken. During the commotion, Anelly came into Manuel's room.

¶ 11　Anelly testified that she saw Jasmine holding S.C. in the middle of the room. Jasmine kept asking why her baby was blue but was otherwise, calm. Anelly also noticed that S.C. was unresponsive, but gurgling, and had blood running from her mouth to her pajamas. She grabbed S.C., laid her on her side, and started rubbing her back, thinking she was choking or having a seizure. Jasmine then left the room. Defendant remained in the room but did not assist Anelly. He was, instead, upset that Selby was present. Selby called for emergency services.

¶ 12　At some point, Jasmine returned to the room. Anelly then left S.C. with Jasmine to let police into the house. Anelly asked defendant what happened with S.C. Anelly recalled that he seemed defensive, and his demeanor was otherwise odd, leading her and Jasmine to believe he was intoxicated. Once paramedics arrived, Anelly and Selby left.

¶ 13　Officer Manuel Cuevas-Escobedo was the first law enforcement officer to arrive. He was aware that Anelly, Selby, Jasmine, defendant, S.C., and G.C. were at the house; he was not aware of anyone leaving through the basement. He observed that S.C.'s face was purple and blue, swollen, she had a bloody lip, and she was trying to cry but could not. When speaking to Cuevas-Escobedo, defendant seemed agitated because Selby was present, and because he was asked about the cause of S.C.'s injuries. Defendant also yelled at Officer Joel Clausing while paramedics tended to S.C. Cuevas-Escobedo testified that he recalled smelling alcohol on defendant when he arrived, but not cannabis.

¶ 14　Cuevas-Escobedo's partner, Officer Lauren Miller, took S.C. from Jasmine. Miller stated that S.C. was very swollen, limp, and "not super responsive." She had dried blood coming from her mouth, her face had a blue color, her diaper was soaked through and leaking, and she was wheezing. Miller did not observe any vomit in the room and did not see any obstructions in S.C.'s

mouth or nose. Miller also noticed that defendant was behaving erratically. Paramedics arrived shortly thereafter, and S.C. was taken to the hospital.

¶ 15    Dr. Sagar Shah was the physician who saw S.C. upon her arrival at Rush Copley Hospital. By stipulation, Dr. Shah noted that, when S.C. arrived at the hospital, she was "minimally responsive, disoriented, grunting, minimally moving all extremities, and displayed injuries consistent with non-accidental trauma." Dr. Shah also observed, "bruising on the lower mouth, around her nose, the lower face, and left upper chest" and noted "the frontal frenulum was torn, and *** there was blood in her mouth." S.C. was intubated, and a CT scan and x-rays were performed. Based on those tests, Dr. Shah determined that S.C. had a "subdural hemorrhage, epidural hemorrhage, intraparenchymal hemorrhage all within the brain, as well as concerns of a right mid ulnar fracture on her arm." S.C. also had acute respiratory failure with hypoxia and lactic acid acidosis. Due to the severity of her injuries, S.C. was airlifted to Loyola University Hospital (Loyola Hospital).

¶ 16    S.C.'s injuries were photographed at Loyola Hospital. She had discoloration and bruising on her face and chest, swelling around her eyes, and blood around her nose and mouth. One of her chest bruises had a distinct curved pattern to it.

¶ 17    Dr. Mary Jones was consulted regarding S.C.'s care upon her admission to Loyola Hospital and through the remainder of January 2021. Dr. Jones was certified as an expert in child abuse pediatrics. She reviewed S.C.'s past medical records and patient history, conducted interviews, and examined S.C. Based on her analysis, she testified that S.C. suffered quadriparesis seizures that limited S.C.'s mobility in her extremities. This type of seizure can both be triggered by the injury or have a delayed onset due to irritation of the brain from the bleeding. Dr. Jones did not witness S.C. having a seizure because she had already been sedated and intubated upon arriving at

the hospital. Dr. Jones was aware that S.C. was born prematurely with cocaine in her system, however, she opined that she did not believe this would cause seizures.

¶ 18   Dr. Jones testified that S.C. also had a frenulum tear, which is not uncommon in mobile toddlers, but could not have been self-inflicted here since S.C. was immobile. She also observed bruising, but no retention of fluid. S.C.'s chest bruise was not self-inflicted and appeared to have a circular shape suggesting an implement was used. Dr. Jones also observed bruising on S.C.'s forehead, on the left side of her face and eye, and in and around her left ear. There were reports of bruising on the right side of S.C.'s face, but Dr. Jones did not observe this. S.C. also had retinal hemorrhaging, which Dr. Jones concluded was commonly seen in incidences of abuse or high-energy impacts, like rollover car accidents.

¶ 19   Regarding S.C.'s subdural hemorrhaging, Dr. Jones found that S.C. had multiple focal points of hemorrhaging, indicating that she suffered abusive head trauma, high-energy impact, and/or shaking. Shaking causes multiple points of hemorrhaging during impact because there is acceleration, deceleration, and rotation of the brain inside the skull. S.C.'s CT scan initially showed bleeding on the right side of the brain; however, five days later the MRI showed chronic subdural hemorrhaging on the left side as well. The MRI also showed signal abnormality and restricted diffusion. S.C. did not have broken bones, fractures, or soft tissue swelling. Dr. Jones indicated that infants with severe brain injuries, like S.C., would likely lose consciousness, but she would not expect them to cry or even regain consciousness and start crying. Instead, infants may gasp if they are having difficulty breathing. An infant with more minor injuries might remain conscious, vomit, and act irritable and fussy.

¶ 20   Dr. Jones concluded that S.C.'s injuries were likely due to non-accidental, abusive trauma. She did not believe that another small child or an animal could have caused S.C.'s injuries. She

opined that the bruising was caused by blunt-force trauma and that S.C.'s brain hemorrhaging was caused by shaking. Dr. Jones was unable to determine which injury occurred first.

¶ 21 Officer Ruben Rodriguez testified that he was doing rounds at the cells in the Aurora Police Department when defendant got his attention. He stated that he wanted to speak with a detective and that he loved his girls and did not know if he kicked S.C.

¶ 22 Detective Jennifer Hillgoth interviewed defendant about S.C.'s injuries. During the interview, defendant repeatedly denied remembering much of what happened immediately prior to discovering S.C.'s injuries because he was intoxicated. Defendant admitted that, two days prior, he expressed doubts about his parentage of S.C.; however, he claimed that those doubts were never serious because S.C. had his eyes. On the night S.C. was injured, defendant remembered going down to his father's room because he was upset with Jasmine. Defendant stated that he took the children with him because he normally took care of them at night, and he did not trust Jasmine alone with them. When defendant moved S.C. downstairs, she was "fine" and "everything was okay." Defendant stated that he laid next to G.C. in Manuel's bed and placed S.C. at the foot of the bed on a blanket. He did not remember feeding S.C. Defendant suggested that perhaps he kicked S.C. or stepped on her as he was getting out of bed. However, he did not remember doing so.

¶ 23 After closing arguments, the circuit court took the case under advisement and continued the case for its ruling. On June 3, 2022, the court entered a written order finding that there was no direct evidence identifying the perpetrator but that defendant: (1) moved the children from his shared room with Jasmine to his father's room downstairs, and, prior to this movement, no one reported that S.C. was injured; (2) was the only adult in the room with S.C. immediately prior to her sustaining injuries; (3) stated that Jasmine did not injure the children; (4) apologized to Jasmine

for a reason unknown to Jasmine at the time; (5) had a motive—Jasmine's infidelity may have impacted S.C.'s parentage, which he was confronted with prior to S.C.'s injuries; and (6) was intoxicated before, during, and after S.C.'s injuries were discovered, but not so bereft of reason to negate intent. The court also noted that the police interrogation video was "very manipulative" and, despite defendant suggesting ways in which S.C. may have been injured, he maintained that he did not remember how she sustained her injuries. The court found defendant guilty of both aggravated battery and aggravated domestic battery.

¶ 24　Defense counsel moved for a new trial, arguing that the State failed to prove that S.C. was shaken, and that defendant was the perpetrator. The circuit court denied the motion. The court then sentenced defendant to 12 years' imprisonment for aggravated battery. No motion to reconsider sentence was filed. This timely appeal followed.

¶ 25　　　　　　　　　　　　II. ANALYSIS

¶ 26　On appeal, defendant argues that the State failed to prove him guilty of aggravated battery beyond a reasonable doubt, and that counsel was ineffective by failing to call an expert witness regarding: (1) the unreliability of shaken baby syndrome and abusive head trauma findings, (2) the onset of overt symptoms, and (3) the role of congenital defects in this case. The State contends that defendant was proved guilty beyond a reasonable doubt and that defendant's claim of ineffectiveness is not ripe for review, and, even if it was, defendant did not suffer prejudice due to counsel's actions.

¶ 27　　　　　　　　　　A. Sufficiency of the Evidence

¶ 28　Defendant first challenges the sufficiency of the evidence against him. He notes that, although he was the last known caregiver for S.C. prior to the discovery of her injuries, the State failed to prove that S.C.'s injuries were inflicted immediately prior to the overt onset of her

condition. Accordingly, the identity of the person who hurt S.C. was not proven because multiple people could have caused S.C. harm. The State responds that the evidence established that defendant had the means, motive, and opportunity to injure S.C. while she was solely in his care. For the reasons that follow, we agree with the State.

¶ 29    A person at least 18 years old commits aggravated battery to a child when "in committing a battery, he [or she] *** knowingly and without legal justification by any means: (1) causes great bodily harm *** to any child under the age of 13 years." 720 ILCS 5/12-3.05(b)(1) (West 2022). "A person commits battery if he [or she] *** knowingly without legal justification by any means (1) causes bodily harm to an individual ***." 720 ILCS 5/12-3(a)(1) (West 2022).

¶ 30    Identity of the accused may be established by circumstantial evidence. *People v. Larson*, 82 Ill. App. 3d 129, 137 (1980). Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence. A defendant can be convicted based solely on circumstantial evidence. The trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). "It is sufficient if all the evidence taken as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Edwards*, 218 Ill. App. 3d 184, 196 (1991). A conviction based on circumstantial evidence must rest on proof of a conclusive nature that tends to lead to a satisfactory conclusion and produces a reasonable and moral certainty that the defendant and no one else committed the crime. *People v. Williams*, 66 Ill. 2d 478, 484-85 (1977).

¶ 31    When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. The trier of fact is responsible for deciding the weight to be given the witnesses' testimony, the credibility of the witnesses, and the reasonable inferences to

be drawn from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). In addressing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. We conclude that the evidence was sufficient to sustain defendant's conviction. Viewed in the light most favorable to the State, a rationale trier of fact could have found beyond a reasonable doubt that defendant caused S.C.'s injuries given the timeline of S.C.'s symptoms, defendant's motive, and the opportunities that existed for injury to occur.

¶ 32    Jasmine's testimony and defendant's police interview established a timeline of the night S.C. was injured. Both parties agree that, on January 9, 2021, around 9 or 10 p.m., they were playing Monopoly in the kitchen and drinking alcohol. During the game, Jasmine received a phone call from the man she met at the drug rehabilitation facility. This phone call upset defendant and led him to drink more alcohol. Sometime thereafter, both parties went upstairs with the children; Jasmine put S.C. in the Pack 'n Play in the upstairs living-room area and placed G.C. in Jasmine's bed. At this time, S.C. did not appear to have any injuries. Jasmine recalls laying with G.C. to help her fall asleep, and, eventually, she also fell asleep. Contrarily, defendant claims that he and Jasmine had another discussion upstairs, which resulted in another disagreement.

¶ 33    Both parties recall defendant taking both children downstairs, to Manuel's room, to sleep. Jasmine testified that this occurred around 2 a.m. Defendant stated that S.C. was still "fine" and "everything was okay" when he got downstairs with the children. Defendant slept adjacent to G.C. on the bed and placed S.C. at the foot of the bed. Around 4 a.m., both parties agree that defendant: shouted for Jasmine, met her at the top of the stairs, and was crying and apologizing. Jasmine asked defendant about the children's well-being, and defendant stated they were "fine." During

this encounter, both parties claimed they heard something downstairs; Jasmine, specifically, stated that she thought she heard one of the children crying. Both parties proceeded to Manuel's room and, eventually, discovered that S.C. was gasping. From there, the extent of S.C.'s injuries were discovered, and emergency services were called.

¶ 34    The evidence viewed in the light most favorable to the State shows that S.C. was uninjured in the afternoon at the time she was placed in the Pack 'n Play and at the time that she was moved from the upstairs to the downstairs bedroom. Sometime after this point, S.C. sustained visible bruising and an injury to her face that resulted in blood running from her mouth to her pajamas. S.C. was also nonresponsive, gasping, and gurgling. It was also discovered later that S.C. had brain hemorrhaging, retinal hemorrhaging, and suffered a quadriparesis seizure.

¶ 35    Dr. Jones testified that S.C.'s bruising was likely from blunt force trauma. The bruising occurs immediately in areas with minimal amounts of fatty tissue. For example, she opined that a shin bruise would appear quickly, and, in her medical opinion, there was not an appreciable difference in the onset of bruising on the shin compared to the face. Moreover, Dr. Jones testified that S.C. had non-accidental severe brain hemorrhaging and retinal hemorrhaging, which is associated with abusive head trauma, like shaking. Infants with this condition would likely immediately lose consciousness after the injury. She would not expect them to cry or even regain consciousness and start crying. Instead, infants may gasp once they regain consciousness, if they are having difficulty breathing. Considering Dr. Jones' testimony, the circuit court made the reasonable inference that the onset S.C.'s injuries was very close in time to when her injuries were discovered.

¶ 36    During this crucial period, defendant was the only adult in exclusive control over S.C., and there was no indication or evidence that an unknown person entered the house. Defendant and

Jasmine agreed that defendant had both children in the downstairs bedroom for several hours before S.C. injuries were discovered, and, prior to moving S.C. downstairs, there was no indication she was injured. The court was in the best position to determine the credibility of Jasmine and defendant's statements regarding S.C.'s condition throughout the night, and we do not believe that an expert opinion was necessary here, especially regarding S.C.'s overt symptoms (bruising and bleeding). Moreover, defendant stated that Jasmine did not injure S.C. The trial court made a reasonable inference, based on the above testimony, that defendant had the sole opportunity and means to harm S.C.

¶ 37    Defendant primarily relies on *People v. Kobischka*, 2022 IL App (3d) 190578-U, to argue that there was no reliable evidence establishing when S.C. was injured. We find *Kobischka* distinguishable. There, the child, K.H., had cold symptoms and symptoms of injury that persisted over several days. During this time, the defendant and others came into contact with K.H. while her mother was at work. K.H.'s mother noticed "projectile vomiting" over several days, lethargy, increased naps, difficulties eating, fussiness, a bruise on K.H.'s foot, and a seizure several days after the vomiting began. *Id.* ¶¶ 9-11. After the onset of these symptoms, K.H. was taken to the hospital where doctors discovered "skull fractures, subdural hematomas, retinal hemorrhages, and 'possibly shaken baby syndrome.' " *Id.* ¶ 9. K.H.'s physicians could not pinpoint when her injuries took place, but one physician noted that the seizures may start subtly but would likely take place hours, not days, after an injury. *Id.* ¶ 38. The reviewing court held that based on the multi-day timeline, the multitude of individuals that interacted with K.H., and the onset of K.H.'s symptoms, there was a reasonable doubt that the defendant had exclusive control over K.H. at the time her injuries were inflicted. *Id.* ¶ 40.

¶ 38 This is simply not the case here. The onset of S.C.'s injuries occurred over hours, not days. There were five adults at home on January 9, 2021: Jasmine, defendant, Anelly, Selby, and Manuel. There were no unknown individuals in the home, and, immediately preceding the discovery of S.C.'s injuries, she had been in defendant's exclusive care for approximately two hours. Prior to being in the defendant's exclusive custody, S.C. was taken upstairs by Jasmine to rest. Jasmine testified that S.C. did not appear injured at this time. Defendant also stated in his interrogation that Jasmine did not harm S.C. The evidence suggests S.C. was injured sometime after defendant took S.C. downstairs to Manuel's room around 2 a.m. and before the discovery of her injuries at 4 a.m. Viewed in the light most favorable to the State, the evidence indicates that defendant was the only adult with S.C. during the time she was injured. Moreover, Dr. Jones opined that the cause of S.C.'s injuries was not accidental, caused by a dog, or caused by another young child. Accordingly, unlike *Kobischka*, there was sufficient circumstantial evidence indicating that defendant caused S.C.'s injuries.

¶ 39 Further, considering the evidence in the light most favorable to the State, defendant also had a motive to harm S.C. Defendant and Jasmine agreed that they began the night of January 9, 2021, drinking, smoking, and playing Monopoly in an attempt to reconcile their relationship because defendant recently discovered that Jasmine cheated on him. During their game, the man Jasmine met at the drug rehabilitation facility called her, and defendant answered the phone. Defendant was admittedly upset during and after the call, especially because he briefly doubted his paternity of S.C. due to Jasmine's infidelity. After the call, Jasmine decided to take herself and the children to bed because defendant was very angry. Defendant accompanied everyone upstairs. In defendant's interview, he stated that he and Jasmine had another disagreement regarding Jasmine's infidelity after following her upstairs. After being confronted with Jasmine's infidelity

several times that night and the realization that S.C. might not be his biological child, defendant was in exclusive control of S.C. during the crucial time the evidence suggests S.C. was injured. It was, therefore, a rational inference for the circuit court to determine that defendant had a motive to harm S.C.

¶ 40    Accordingly, in viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could find that defendant knowingly caused great bodily harm to S.C. while she was in his exclusive control. *People v. Saxon*, 374 Ill. App. 3d 409, 418 (finding that, in the light most favorable to the State, evidence of motive, means, and opportunity was sufficient to support a conviction based on circumstantial evidence beyond a reasonable doubt).

¶ 41                                    B. Ineffective Assistance of Counsel

¶ 42    Next, defendant contends that he was denied effective assistance of counsel where trial counsel failed to call an expert witness on shaken baby syndrome or abusive head trauma to test the State's theory of the case. The State asserts that the record is insufficient to review a claim of ineffective assistance of counsel, where it fails to address why defense counsel failed to call their consulted expert at trial. For the following reasons, we agree that this claim is better suited for collateral review.

¶ 43    Claims of ineffective assistance of counsel are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail under *Strickland*, a defendant must demonstrate that counsel's assistance was both deficient and prejudicial. *People v. Harris*, 225 Ill. 2d 1, 20 (2007). More precisely, a defendant must establish that counsel's assistance was objectively unreasonable under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. *Id.* A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.*

¶ 44    Judicial scrutiny of counsel's performance must be highly deferential. *Strickland*, 466 U.S. at 689. Indeed, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To overcome this presumption of soundness, the strategies "must appear irrational and unreasonable in light of the circumstances that defense counsel faces at the time" such that "no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies." *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (5th Dist. 1997). " '[S]trategic choices made after thorough investigation of law and facts relevant to plausible opinions are virtually unchallengeable.' " *People v. Harris*, 225 Ill. 2d 1, 49 (quoting *Strickland*, 466 U.S. at 690). An attorney's decision regarding whether to present a particular witness is generally a strategic choice that does not support an ineffective-assistance-of-counsel claim. *People v. Klein,* 2015 IL App (3d) 130052, ¶ 72; see also *People v. Davis*, 353 Ill. App. 3d 790, 795 (2004) (noting the presumption that "a challenged omission was trial strategy"). We review *de novo* whether an omission by counsel supports an ineffective assistance claim. *Davis,* 353 Ill. App. 3d. at 794.

¶ 45    The core of defendant's argument is that his trial counsel was ineffective because he failed to present an expert witness to challenge Dr. Jones' testimony that S.C.'s injuries stemmed from shaken baby syndrome or abusive head trauma. In support of this contention, defendant points to several federal, Illinois, and other jurisdictions' "shaken baby" cases wherein the medical determination was challenged. See *Cavazos v. Smith*, 565 U.S. 1, 12-15 (2011); *People v. Petrie*,

2021 IL App (2d) 190213, ¶ 67-83; *Commonwealth v. Millien*, 474 Mass. 417, 441, 50 N. E. 3d 808 (2016). None of these cases, however, suggest that a failure to present an expert constitutes *per se* ineffective assistance of trial counsel. Instead, as *Petrie* suggests, cross-examination on the basis of the State's expert's opinion is sufficient. *Petrie,* 2021 IL App (2d) 190213, ¶¶ 72, 75 (finding counsel was ineffective for failing to cross-examine a medical expert on the basis of his opinion). A lengthy, knowledgeable, and in-depth cross-examination of Dr. Jones occurred here. Accordingly, defense counsel's failure to call an expert to testify, alone, is not sufficient to establish ineffective assistance of counsel.

¶ 46    Next, defendant asserts that a counter expert was required here because he or she *could have* shed light on the *unexplored possibility* that S.C. had a "lucid interval," *i.e.*, a period of lucidity between the time an injury occurs and the appearance of overt symptoms. It is apparent from the record that trial counsel sent S.C.'s medical reports to defendant's own expert for examination. Counsel even suggested a new hearing date, at the September 29 hearing, to discuss the defense expert's findings and to potentially name another expert, presumably for trial. Nonetheless, a defense expert never appeared at trial. Based on the inadequacy of this record, it is conceivable that trial counsel consulted with the pre-trial expert regarding "lucid intervals" and could find no support for his position, despite the varied case law cited by defendant. *Kobischka*, 2022 IL App (3d) 190578-U (finding the onset of injury would happen after hours, not days); *Petrie*, 2021 IL App (2d) 190213 (finding no lucid interval); *People v. Cook,* 2014 IL App (1st) 113079, ¶ 17 (finding that lucid intervals could last "minutes, hours, days, or months").

¶ 47    The complete lack of information here requires us to speculate as to the expert's findings and the discussions the expert may or may not have had with trial counsel. The basis for trial counsel's decision to not call an expert witness regarding shaken baby syndrome—whether rooted

in unavailability, financial constraints, oversight, or otherwise—is not discernable from the record. See *Massaro v. United States*, 538 U.S. 500, 505 (2003) (noting that a trial record may contain no evidence of an omission, much less the reasons underlying an omission). To the extent that defendant argues that his trial counsel was ineffective because he failed to present expert testimony to challenge the unexplored possibility that S.C. had a lucid interval prior to the onset of her injuries, the record is inadequate for our review, and the claim is better suited for presentation in a postconviction petition where counsel can present affidavits from trial counsel and the defense expert. See, *e.g., People v. Gayden*, 2020 IL 123505, ¶ 38. Moreover, because we could not evaluate the merits of this claim, this issue may be raised in a collateral appeal without overcoming the issue of forfeiture.

¶ 48                                     III. CONCLUSION

¶ 49    For the reasons stated, we affirm the judgment of the circuit court of Kane County.